JUDGE NATHAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**12 CIV 4098** (AJN)

---------------------------------------------------------------X

Case No.:

ELENI HENKEL,

**COMPLAINT**
(Jury Trial Demanded)

Plaintiff,

-against-

STEPHEN WAGNER and COHEN TAUBER
SPIEVACK & WAGNER, P.C.,

Defendants

---------------------------------------------------------------X

RECEIVED
MAY 23 2012
U.S.D.C. S.D. N.Y.
CASHIERS

ECF CASE

Plaintiff, Eleni Henkel, complaining of the Defendants, Stephen Wagner, and Cohen

Tauber Spievak & Wagner, P.C. by her attorneys Russ & Russ, P.C., alleges as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover monetary damages for legal malpractice against an

attorney and his law firm (the "Defendants").

2.     Defendants a) failed to assert and abandoned Plaintiff's meritorious causes of

action in the underlying action in New York State, New York County Supreme Court, for

employment and work-related compensation on theories of breach of contract, quantum meruit,

unjust enrichment and claims pursuant to New York State Labor Law, and b) withdrew without a

trial on the merits, and abandoned, Plaintiff's causes of action for declaratory and monetary relief

in the underlying action, related to Plaintiff's claim of equity, membership and status as

"partner" in the business entity, SGG Partners, LLC ("SGG LLC"), and c) turned over to counsel

for SGG LLC copies of source materials and documents of SGG LLC, which were critical

evidence and establishing Plaintiff's damages against SGG LLC, and upon information and

belief, failed to make copies of same, and d) failed to move to amend the complaint, or otherwise amend the complaint, and abandoned the amendment of the complaint in the underlying action, despite the necessity to do so and Defendants' stated intention to do so, and after obtaining leave of Court to do so, and e) failed to appear at a mandatory Court conference on July 21, 2011, and abandoned the Plaintiff, at which time the Court issued an Order that failure of the Defendants to appear a second time would result in the conversion of the earlier dismissal of the complaint as one without prejudice, to a dismissal with prejudice, and f) failed to appear at a mandatory Court conference on September 22, 2011, and abandoned the Plaintiff, at which time the Court issued an order that the earlier dismissal of the complaint would be with prejudice, and g) failed to seek the modification or vacatur of either or both Orders of the Court (which had issued upon the Defendants' failure to appear) and abandoned the Plaintiff, and h) failed to provide any written or oral explanation to Plaintiff, or to her subsequent counsel, David M. Pohl, Esq., of Pohl, LLC, as to why Defendants had failed to amend the complaint, or appear at two (2) mandatory Court conferences, or provide any affidavits to Mr. Pohl of acceptable excuses for the non-appearance on two (2) occasions by the Defendants. The necessary amendment of the complaint was to assert for the first time the employment and work-related compensation causes of action of Plaintiff against SGG LLC, which causes of action became barred (and subject to dismissal) when the Defendants' failure to appear at two (2) mandatory Court conferences caused the "with prejudice" dismissal of the complaint.

3.     The effect of these acts and omissions, which were departures from good and accepted practice, and which constituted legal malpractice and negligence, was that when Mr. Pohl asserted those very causes of action on behalf of Plaintiffs, as counterclaims in a subsequent action, the counterclaims were dismissed, with prejudice, by Justice Fried (the same Justice as in

the underlying action) on the grounds of the binding res judicata and collateral estoppel effect of the dismissal, with prejudice, in the underlying action.

4.    The effect of these acts and omissions are that Plaintiff has been deprived of her right to assert and prosecute her meritorious causes of action for employment and work-related compensation against SGG LLC.

5.    The effect of these acts and omissions are that Plaintiff has been deprived of her right to a trial on the merits, after discovery, of her causes of action for declaratory and monetary relief related to Plaintiff's claim of equity, membership and status as "partner" in SGG LLC, and all rights, benefits and interests of a member or "partner."

6.    Plaintiff's proof of damages has been potentially damaged by the loss of evidence caused by Defendants' turning over such evidence to counsel to SGG LLC, and upon information and belief, failed to make copies; In the event that Plaintiff is unable to recover such evidence from Defendants or SGG LLC, then plaintiff is entitled to a declaration that Defendants are estopped from defending the damages case against them to the extent that it might be compromised by the Defendants' own acts and omissions which caused the loss of evidence.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 ("diversity of citizenship jurisdiction") in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and because the Plaintiff and the Defendants are citizens of different states.

8.    Venue is proper in this District pursuant 28 U.S.C. §1391(a) in that a substantial part of the acts, events and transactions alleged herein occurred in substantial part in this District, and because the Defendants transact business in the District.

## PARTIES AND STATEMENT OF THE CLAIMS

**A.    The Plaintiff**

9.    Plaintiff is a citizen of Connecticut, residing at 709 Lake Avenue, Greenwich, Connecticut 06830.

**B.    The Defendants and their Relationship**

10.    Defendant, Stephen Wagner ("Wagner"), is a citizen of New York, residing at 852 Woodmere Place, Woodmere, New York 11598.

11.    Defendant, Cohen Tauber Spievack & Wagner, P.C. ("CTSW") is a law firm and a professional corporation, organized and existing under the laws of New York, maintaining business premises at 261 Madison Avenue, New York, New York 10016.

12.    Upon information and belief, at all times hereinafter mentioned, Wagner was and still is a shareholder of CTSW.

13.    Upon information and belief, at all times hereinafter mentioned, Wagner was and still is an officer and/or director of CTSW.

14.    Upon information and belief, at all times hereinafter mentioned, Wagner was and still is an employee of CTSW.

15.    At all times hereinafter mentioned, the acts and/or omissions of Wagner were in the course of his employment and/or engagement with CTSW, and such acts and/or omissions bind CTSW pursuant to the doctrine of respondeat superior.

16.    At all times hereinafter mentioned, the acts and/or omissions of Wagner were approved and/or ratified by CTSW.

17.    Upon information and belief, at all times hereinafter mentioned, Wagner worked on Plaintiff's legal matter with certain other attorneys of CTSW, who were officers and/or directors

4

of CTSW and/or employees of CTSW ("Other Staff")

18.    At all times hereinafter mentioned, the acts and/or omissions of Wagner and the Other Staff were in the course of his and their employment and/or engagement with CTSW, and such acts and/or omissions bind CTSW pursuant to the doctrine of respondeat superior.

19.    At all times hereinafter mentioned, the acts and/or omissions of Wagner and the Other Staff were approved and/or ratified by CTSW.

## C.    The Underlying Claim

20.    At all times hereinafter mentioned, Plaintiff was and still is in the executive search business, specializing in personnel placement focused, primarily, on the needs of the financial industry (including hedge funds, private equity firms and investment banks).

21.    In or about April, 2008, Plaintiff affiliated for compensation with Sheri Gellman ("Gellman") in the performance of such placement services.

22.    Such affiliation between Plaintiff and Gellman was, initially, employment through an entity known as SGP/JSY, Inc. ("SGP/JSY"), and thereafter, employment through its successor, SGG LLC.

23.    Plaintiff performed services for SGG LLC and is entitled to compensation for such services, either as employment compensation, or as quantum meruit, or under a theory of unjust enrichment, or otherwise, or as distributions to a membership or "partner" (holder of equity) in SGG LLC.

24.    The services performed by Plaintiff for SGG LLC in 2009 and thereafter consisted of the management and operation of the "Junior Business" of SGG LLC, as later defined, and the generation of revenues therefrom, and a broad array of executive and management functions for SGG LLC.

25.    In or about 2010, disputes arose between Plaintiff and SGG LLC as to the nature, extent and status of Plaintiff's affiliation with Gellman and SGG LLC, her right to co-manage SGG LLC with Gellman, her right to distributions and profit-sharing from SGG LLC, her right to employment and work-related compensation from SGG LLC, her right to a buy-out from SGG LLC in the event of a dis-affiliation, her right to funds upon the dissolution of SGG LLC, the terms of an Operating Agreement of SGG LLC, and other issues relating to SGG LLC and Plaintiff's business relationship with Gellman.

26.    Plaintiff claimed that Plaintiff and Gellman were co-members and partners; Plaintiff claimed to be entitled to employment and work-related compensation whether or not she and Gellman were co-members and partners.

27.    In or about December, 2010, Plaintiff met with, consulted with, shared information and documents with, and sought and received legal advice and counsel from, Defendants.

28.    In connection with all such disputes, Defendants recommended the commencement and prosecution of an action to enforce certain of Plaintiff's rights and for damages and related relief.

29.    In connection with all such disputes, Defendants recommended the commencement and prosecution of an action to enforce Plaintiff's rights as a member, "partner" and equity holder in SGG LLC, and recommended that the causes of action for employment and work-related compensation be delayed until a later date, when Defendants would assert them.

30.    In connection with all such disputes, Defendants determined, based upon the facts and documents available to them, that Plaintiff had meritorious causes of action against Gellman and SGG LLC based upon a) Plaintiff being a member or "partner" of SGG LLC, and b) Plaintiff

and Gellman having entered into an oral partnership agreement in the Fall of 2007, and c) Plaintiff and Gellman having entered into an oral partnership agreement at the end of 2009.

**D.    The Engagement/Retention of Counsel**

31.    In or about December 12, 2010, Plaintiff engaged Defendants, pursuant to a written engagement agreement, which, generally, describes the engagement as "to provide you with legal service in connection with your dispute with Sheri G. Gellman and various entities with which she is affiliated, and such other matters that you may refer to us from time to time."

32.    Defendants advised and informed Plaintiff that Plaintiff possessed meritorious causes of action against SGG LLC for, the following: a) a declaration that Plaintiff was and is a fifty (50%) percent equity owner, member or "partner" of SGG LLC in 2010 and sixty (60%) percent equity owner in 2011 and thereafter, and b) a distribution of profits of SGG LLC, and c) employment and work-related compensation from SGG LLC based upon contract, and d) employment and work-related compensation from SGG LLC based upon the fair and reasonable value of services (quantum meruit), and e) employment and work-related compensation from SGG LLC based upon unjust enrichment, and f) employment compensation based upon the New York State Labor Law, and g) a preliminary and permanent injunction against SGG LLC barring and enjoining conduct by Gellman and SGG LLC, which deprived and deprives Plaintiff of her rights, powers and benefits as an equity holder, member and "partner" of SGG LLC.

33.    Based upon Defendant's advice, Plaintiff authorized the commencement and prosecution of an action for damages and related relief against SGG LLC, which Defendants commenced in or about December, 2010.

34.    In said action, Defendants intentionally did not assert Plaintiff's causes of action for employment and work-related compensation.

7

E.     **The Causes of Action asserted by Defendants**

35.     In their complaint on behalf of Plaintiff in the New York State Supreme Court, New York County, a copy of which is annexed as **Exhibit "A"** and made part hereof ("State Court Complaint"), Defendants alleged the existence of two (2) separate agreements between Plaintiff and SGG LLC, one in late 2007 or early 2008 to the effect that Plaintiff would become a "partner" of SGG LLC, and one at the end of 2009, that Plaintiff and Gellman had become "partners" in SGG LLC.

36.     In the State Court Complaint, Defendants alleged six (6) causes of action, to wit: 1) for a declaratory judgment that Plaintiff was a member or "partner" of SGG LLC, 2) for damages for breach of the contract in late 2007 or early 2008 that Plaintiff would become a member or "partner" of SGG LLC, 3) for damages for breach of contract at the end of 2009 that Plaintiff had become a member or "partner" of SGG LLC, 4) for an accounting as a member or "partner" of SGG LLC, 5) for a finding of promissory estoppel based upon reliance, that SGG LLC cannot deny that Plaintiff was and is a member or "partner" of SGG LLC, 6) for damages based upon unjust enrichment based upon SGG LLC, or its predecessor firm, SGP/JSY, having accepted Plaintiff's services.

37.     In the State Court Complaint, Defendants intentionally did not assert any causes of action for employment or work-related compensation. Specifically, defendants intentionally did not assert causes of action for breach of a contract of employment, whether oral or written, or one implied in law, or for the fair and reasonable value of services rendered (quantum meruit), or claims under the New York State Labor Law.

38.     In the State Court Complaint, Defendants intentionally did not assert any alternative or inconsistent causes of action, which are permitted by law.

8

39.     In the State Court Complaint, Defendants intentionally did not assert any causes of action alleging that a profit-sharing arrangement between Plaintiff and Gellman was enforceable as a compensation term of employment or the providing of services by Plaintiff, independent of any claim by Plaintiff of membership or partnership.

40.     In or about January, 2011, Defendants moved the New York State Supreme Court, New York County, for a temporary restraining order and preliminary injunction, seeking to prevent Gellman from obstructing and cancelling meetings between Plaintiff and candidates for employment, and preventing Gellman from interfering with the operation by Plaintiff of the "Junior Business" of SGG LLC.

41.     In response to the motion and State Court Complaint, Gellman and SGG LLC opposed the motion and moved to dismiss each cause of action of the State Court Complaint, based upon New York CPLR §3211(a) 1, 5, and 7.

**F.     The Submissions and letters from and by counsel/ Defendants' continuous awareness that Plaintiff possessed meritorious un-asserted causes of action for employment and work-related compensation**

42.     The written submissions to the New York State Supreme Court, New York County, contained numerous references to Plaintiff's meritorious but un-asserted causes of action.

43.     In a letter, dated January 21, 2011, from Wagner to New York State Supreme Court Justice Fried ("Justice Fried"), Wagner asserted that since 2009, Plaintiff had total control over SGG LLC's "Junior Business" (the placement of analysts and other junior financial services professionals), the hiring of the team, liaison with existing and potential clients, communications and contacts with candidates, administration of all of the Junior Business, the successful completion of nearly sixty (60) separate searches, and the placement of over one hundred (100) candidates with SGG LLC clients.

9

44. In said letter, Wagner asserted that the compensation arrangement between Plaintiff and SGG LLC for 2010 was that Plaintiff would receive the first five hundred thousand ($500,000) dollars of profit of SGG LLC, that Ms. Gellman would receive the next five hundred thousand ($500,000) dollars of profit of SGG LLC, and that the remainder would be split 50/50 between Plaintiff and Gellman. Wagner asserted that Plaintiff had received the first five hundred thousand ($500,000) but nothing thereafter. Wagner asserted that Plaintiff, exclusively, controlled the "Junior Business" of SGG LLC through 2010 and into 2011.

45. In a letter dated January 25, 2011 to Justice Fried, counsel for SGG LLC described Plaintiff as a "management employee."

46. In an affidavit prepared by Defendants for signature by Plaintiff, dated January 16, 2011, Defendants asserted that Plaintiff's "compensation package" at SGG LLC for 2009 consisted of a base salary and a substantial guaranteed bonus (paragraph 21), and the first five hundred thousand ($500,000) dollars (the second $500,000 to Gellman), and fifty (50%) percent of the profits for 2010, and sixty (60%) percent of the profits in 2011, and in subsequent years (paragraph 39).

47. In an affidavit prepared by counsel for SGG LLC for signature by Douglas Coopersmith, dated January 28, 2011, it was asserted that Plaintiff had been an employee of SGP/JSY and continued as an employee of SGG LLC after it was formed in or about February 2, 2010. Counsel for SGG LLC provided a written letter of employment, dated February 22, 2008, signed by Plaintiff on or about February 24, 2008.

48. In an affidavit of Gellman, dated January 27, 2011, Gellman referred to Plaintiff as an "employee" who had been employed by both SGG LLC and JSY.

49. In an affidavit prepared by Defendants for signature by Plaintiff, dated February 4,

10

2011, Defendants described Plaintiff as an employee of SGG LLC.

50.    At a hearing before Justice Fried on February 8, 2011, Justice Fried ruled that his findings on the preliminary injunction motion would not resolve the entire case, stating "If I conclude on preliminary injunction that there is or is not a partnership, it doesn't determine the final question because the preliminary injunction here...never...unless you want to fold the entire case into a preliminary injunction hearing." At said hearing, counsel for SGG LLC agreed with the Court.

51.    In an affidavit of Gellman, dated April 5, 2011, Plaintiff was described as an employee of SGG LLC.

52.    In an affidavit prepared by Defendants for signature by Plaintiff, dated April 6, 2011, Defendants asserted that Plaintiff began as an employee of SGP/JSY and became a partner.

53.    At an evidentiary hearing in further of Defendants motion on behalf of Plaintiff for a preliminary injunction, Defendants and SGG LLC both elicited testimony that Plaintiff was entitled to employment and work-related compensation from SGG LLC, and Defendants indicated their intention of asserting causes of action for employment and work-related compensation on behalf of Plaintiff.

54.    Despite all of these references and admissions that Plaintiff was an employee, had provided employment services, or work-related services, and was entitled to employment or work-related compensation from SGG LLC (whether or not she was found to have been a member or partner), Defendants never asserted such claims and causes of action for Plaintiff.

**G.    The Court's decision in April, 2011 on the Preliminary Injunction hearing**

55.    By Decision and Order of Justice Fried, dated April 18, 2011, Justice Fried found that the only issue before him was "the likelihood of success on plaintiff's claim that there was

11

an oral partnership agreement between Henkel and Gellman." The Court recited that Plaintiff had earned one million two hundred thousand ($1,200,000) dollars in 2008 and one million five hundred thousand ($1,500,000) dollars in 2009. The Court recited that Plaintiff was to receive the first five hundred thousand ($500,000) dollars (Gellman the second five hundred thousand dollars) and fifty (50%) percent of the profits in 2010.

56. In said Decision and Order, the Court denied the preliminary injunction and found that "Henkel is unlikely to succeed on her claim that she and Gellman entered into an enforceable partnership agreement." ("Order 1"). A copy of Order 1 is annexed hereto as **Exhibit "B"**.

**H.    Defendants withdraw Plaintiff's member/partner claim against SGG LLC/the events in May 2011**

57. In or about May, 2011, Defendants finally determined to assert Plaintiff's causes of action for employment and work-related compensation.

58. In an email from Wagner to Plaintiff and to Howard J. Kaplan, Esq. ("HJK"), an attorney informally consulting with Plaintiff, dated May 11, 2011, Wagner asked: "procedurally, should the existing case be dismissed and a new quantum meruit case be filed or amend existing case..."

59. In an email from HJK to Wagner, dated May 13, 2011, HJK asked about the timing of the amendment to the complaint, and Wagner responded to HJK by email, dated May 13, 2011 "....within a few weeks" and, references a conversation with counsel for SGG LLC, writing "...we talked about whether he had a right to oppose the amendment and I told him no and he agreed. He asked me whether I planned on dismissing the case and starting over, and I said I didn't think that made sense, and he agreed. He then agreed that the motion was moot, and

asked me to send him a draft of the letter before I sent it to Fried."

60.     In or about May 16, 2011, Defendants, without Plaintiff's informed consent, determined to voluntarily discontinue Plaintiff's cause of action seeking a declaration and monetary relief based upon being a member or partner of SGG LLC.

61.     In letter from Stephen Wagner, dated May 16, 2011 to Justice Fried, Wagner stated that "Plaintiff has determined voluntarily to dismiss Count 1 of the complaint, which sought a judicial determination that she is a member of SGG Partners, LLC. Pursuant to CPLR 3025 (a) Ms. Henkel will amend the complaint both to eliminate Count 1 and to raise additional causes of action for money damages related to services performed and other agreements between the parties concerning compensation. We expect to serve and file the amended complaint within twenty days."

62.     Defendants' advice to Plaintiff and conduct in voluntarily discontinuing the aforesaid cause of action, was based, in part, upon Defendants' opinion that Justice Fried's findings on the preliminary injunction motion, precluded a trial on the merits, after discovery, of the aforesaid cause of action.

63.     On May 17, 2011, by Decision and Order of same date, Justice Fried granted Gellman's and SGG LLC's motion to dismiss, by dismissing each of the six (6) causes of action of the State Court Complaint, while granting Defendants leave to move to re-plead with an affidavit of merits. A copy of same is annexed hereto as **Exhibit "B2"**.

64.     In the Decision and Order, Justice Fried found that Plaintiff could not rely upon an alleged oral agreement of partnership, because Plaintiff and Gellman had intended to enter into a written agreement, and because draft written agreements stated that they were not legally binding until signed.

13

65.     At a hearing before Justice Fried on May 17, 2011, Wagner stated "….your Honor does not believe that there was a partnership agreement that was entered into…….and as a result, we're not going to continue with allegations that she is a partner and should be reinstated as a partner…therefore, certainly, Count 1 is gone…..However, she did work over the last two years, all of 2010 and…all of 2010 and part of 2011…We believe she brought value to the company, and she has not been compensated for it. So, the action will be in the nature of quantum meruit…"

66.     As of May 17, 2011, after the aforesaid Decision and Order, the case was pending before Justice Fried, for purposes of amendment of the complaint to restate theories of recovery and causes of action, assert new and different causes of action, discovery, and a trial on the merits.

67.     In an email from Wagner, dated May 17, 2011, to Plaintiff, Wagner referenced the Court appearance of May 17, 2011, and stated, in part, "He set a status conference for July 21 in the event that the case goes forward."

68.     In emails from Wagner, dated May 20, 2011, to Plaintiff, Wagner stated "I would be happy to put together a summary of what I believe the money damages case will be…" and "Essentially, the cases indicate that we can bring causes of action for quantum meruit, unjust enrichment or promissory estoppel against SG…….Thus, if the amount we are suing for constitutes wages, you will win…."

## I.     Defendants fail to appear and default on two (2) mandatory Court conferences

69.     On July 21, 2011, Defendants were counsel to Plaintiff and had not taken any steps, whatsoever, to move to be relieved or to terminate the attorney-client relationship.

70.     On July 21, 2011, inexplicably, Defendants failed to appear in Court and

abandoned Plaintiff.

71.    On July, 21, 2011, by Decision and Order of same date, Justice Fried noted that there had been no appearance, and directed the attorneys to appear on September, 22, 2011 at 9:30 am at a mandatory Court conference, holding that Defendants' failure to appear on that date would result in the dismissal of the causes of action being converted to "with prejudice" status.

72.    On and after July, 21, 2011, Defendants were unaware of the aforesaid Decision and Order, and took no steps to procure it, or follow the Court calendar related to the action in which they were the Plaintiff's attorneys of record.

73.    In an email from Wagner, dated August 11, 2011, to Plaintiff, Wagner stated "I am happy to confirm that my partners have no objection to the payment plan we discussed......until January 2012, at which time we will revisit the issue...."

74.    On or about September 1, 2011, Gellman and SGG LLC filed a new action against Plaintiff in New York State Supreme Court, New York County, which was assigned to Justice Fried as a case "related" to the prior case.

75.    In the new action, Gellman and SGG LLC describe Plaintiff as a former employee of SGG LLC.

76.    In an email from Wagner, dated September 2, 2011, to Plaintiff, Wagner stated "We will deal with this and anything else Sherry tries to throw your way."

77.    On September 6, 2011, counsel for SGG LLC sent the new action via email attachment to HJK and HJK sent them to Wagner.

78.    On September 22, 2011, Defendants were counsel to Plaintiff and had not taken any steps, whatsoever, to move to be relieved or to terminate the attorney-client relationship.

79.    On September 22, 2011, inexplicably, Defendants failed to appear in Court and

abandoned Plaintiff.

80.     On September 22, 2011, by Decision and Order of same date, Justice Fried noted that there had been no appearance, and held that Defendants' failure to appear on two (2) dates would result in the dismissal of the causes of action being converted to "with prejudice" status. A copy of the September 22, 2011 Decision and Order is annexed hereto as **Exhibit "C"**.

81.     On and after September, 22, 2011, Defendants were unaware of the aforesaid Decision and Order, and took no steps to procure it, or follow the Court calendar related to the action in which they were the Plaintiff's attorneys of record.

82.     In an email from Plaintiff, dated September 28, 2011, to Wagner, Plaintiff stated "I want to give you a heads-up that David Pohl will be reaching out to you regarding my case. David has his own firm and is going to do a lot of the discovery legwork....."

83.     At no time have Defendants taken any steps, whatsoever, to move to be relieved or to terminate the attorney-client relationship.

**J.      The new case/counterclaims/dismissal by Justice Fried on the basis of res judicata**

84.     In the new case, Plaintiff was and still is represented by David M. Pohl, Pohl, LLP, 345 Seventh Ave, 21st floor, New York, New York 10001, who, in or about October 14, 2011, interposed counterclaims on behalf of Plaintiff for employment and work-related compensation and related damages.

85.     Mr. Pohl alleged therein that in 2010, Plaintiff hired a team of "Junior Business" recruiters, met with potential clients, and generated millions of dollars of revenues for SGG LLC. Mr. Pohl further alleged that SGG LLC "Senior Business" generated millions of dollars in both 2010 and 2011. Mr. Pohl alleged that in 2011 and 2012, millions of dollars of revenues was or would be received by SGG LLC, referable to the services performed by Plaintiff in 2010 and

2011.

86.    Mr. Pohl demand an award of damages to Plaintiff based upon breach of contract, quantum meruit, New York State Labor Law Section 193 (and for liquidated damages of twenty-five (25%) percent under the statute and attorney's fees and costs), promissory estoppel and unfair competition.

87.    In response to these counterclaims, counsel to SGG LLC, on or about November 3, 2011, moved to dismiss, alleging that they were barred by the prior dismissal "with prejudice" and the doctrines of res judicata and collateral estoppel.

88.    In opposition to the dismissal motion, HJK, in an affidavit, dated, December 15, 2011, stated "It was not until November, 2011 that I learned that Ms. Henkel's counsel in the First Action failed to appear for two conferences before the Court, and that the Court had dismissed the First Action."

89.    At a hearing before Justice Fried on February 7, 2012, in connection with the motion to dismiss the counterclaims, Justice Fried found "When the original action between Henkel and Gellman was pending, I dismissed the complaint without prejudice. And I did so to permit Miss Henkel to add new claims by amending the complaint....That amendment was never made, the action was dismissed with prejudice, it become upon disposition on the merits, and it seems to me the counterclaims here, with the exception of the unfair business practices, are claims that could have been brought at that time and therefore, should be barred by res judicata."

90.    At said hearing Justice Fried further found "To me there's no question that the final judgment rule bars the first four causes of action and so, I'm dismissing Counts 1, 2, 3 and 4. That's the breach of contract claim, the quantum meruit claim, Labor Law Article 6, Section 193 claim, the promissory estoppel claim."

17

91.     On February 8, 2012, by Order of same date, Justice Fried granted Gellman's and SGG LLC's motion to dismiss the first, second, third and fourth counterclaims. A copy of the February 8, 2012 Order is annexed hereto as **Exhibit "D"**.

**K.     Defendants remain silent but continue to bill**

92.     During the pendency of the motion to dismiss the counterclaims, Mr. Pohl sought an explanation from Defendants as to their acts and omissions, and their conduct in failing to appear at two (2) mandatory Court conferences.

93.     Defendants have never provided an explanation, whether oral or in writing.

94.     However, Defendants have rendered statements or invoices to Plaintiff, alleging that Plaintiff owes defendants monies for services allegedly rendered by Defendants.

95.     Plaintiff has rejected same.

**L.     Plaintiff's damages proximately caused by the negligence and legal malpractice of the Defendants**

96.     By reason of the Defendants' conduct, Plaintiff is forever barred from presenting, asserting, interposing and prosecuting her meritorious causes of action for employment and work-related compensation, quantum meruit, and claims under the New York State Labor Law, and for unjust enrichment, against Gellman and/or SGG LLC.

97.     By reason of the Defendants' conduct, Plaintiff is forever barred from presenting, asserting, interposing and prosecuting her meritorious causes of action for declaratory and monetary relief related to Plaintiff's claim of equity, membership and status as "partner" in SGG LLC, and all rights, benefits and interests of a member or "partner."

98.     By reason of the Defendants' conduct, Plaintiff's proof of damages has been potentially damaged by, upon information and belief, the loss of evidence caused by Defendants'

turning over such evidence to counsel to SGG LLC, without making copies. In the event that Plaintiff is unable to recover such evidence from Defendants or SGG LLC, then Plaintiff is entitled to a declaration that Defendants are estopped from defending the damages case against them to the extent that it might be compromised by the Defendants' own acts and omissions which caused the loss of evidence.

99.    Source materials and evidence given by Plaintiff to Defendants included numerous binders of SGG LLC documents (several thousand pages) containing, without limitation, some or all of the following: compensation tables with tracked revenues by case/search, financial documentation, banking documentation, accounting and bookkeeping documentation, and emails.

100.    Junior Business services performed by and under the direction of Plaintiff for revenue generation in 2010, consisted of between fifty (50) and sixty (60) placements, the exact amount being presently unknown, which generated approximately three million five hundred thousand ($3,500,000) dollars to four million five hundred thousand ($4,500,000) dollars of revenues to SGG LLC, collected by SGG LLC in 2010, or thereafter.

101.    Upon information and belief, Senior Business services performed in 2010 consisted of an unknown number of placements, which generated approximately four million five hundred thousand ($4,500,000) dollars to five million ($5,000,000) dollars of revenues to SGG LLC, collected by SGG LLC in 2010, or thereafter.

102.    Junior Business services performed by and under the direction of Plaintiff for revenue generation in 2011, consisted of an consisted of approximately forty (40) to forty-five (45) placements, which generated approximately three million ($3,000,000) dollars to three million five hundred thousand ($3,500,000) dollars of revenues to SGG LLC, collected by SGG

19

LLC in 2011, or thereafter.

103.    Upon information and belief, Senior Business services performed in 2011 consisted of an unknown number of placements, which generated approximately four million ($4,000,000) dollars to six million ($6,000,000) dollars of revenues to SGG LLC, collected by SGG LLC in 2011, or thereafter.

104.    Junior Business services performed by and under the direction of Plaintiff for revenue generation in 2012, and thereafter, consisted of between thirty-five (35) and forty (40) placements, the exact amount being presently unknown, which generated approximately two million five hundred thousand ($2,500,000) dollars to three million ($3,000,000) dollars of revenues to SGG LLC, collected by SGG LLC in 2011, or thereafter.

105.    Upon information and belief, Senior Business services performed in 2012 consisted of an unknown number of placements, which generated approximately four million ($4,000,000) dollars to six million ($6,000,000) dollars of revenues to SGG LLC, collected by SGG LLC in 2012, or which is due thereafter.

106.    Plaintiff received only five hundred thousand ($500,000) dollars in 2010, of which nineteen thousand two hundred thirty and 78/100 ($19,230.78) dollars was from JSY, the balance being from SGG LLC.

107.    Plaintiff received only twenty four thousand five hundred nineteen and 27/100 ($24,519.27) dollars in 2011 from SGG LLC.

108.    Plaintiff has not received any additional compensation, work-related payments, wages, profit-distribution or other monies from SGG LLC.

109.    If Plaintiff had been successful in her causes of action to enforce her rights, benefits and interests as a member or partner of SGG LLC, then Plaintiff would have had a

continuing right, year to year, to distributions and profits of SGG LLC, and such membership or partnership interests would have been an asset that could be sold for value.

110.   If Plaintiff had been successful in her cause of action for quantum meruit, Plaintiff would have recovered a) the fair and reasonable value in the New York City marketplace of her services as a recruitment and placement professional, and b) the fair and reasonable value of her services in the New York City marketplace as an executive and manager of SGG LLC.

## DAMAGES FOR LEGAL MALPRACTICE

111.   Plaintiff became a client of Defendants and Defendants assumed the duty and obligation to provide professional services to Plaintiff in accordance with good and accepted practice, and to exercise due care with regard to the affairs, rights, benefits, interests claims and causes of action of Plaintiff, and to perform consistent with the ethical and other requirements of the legal profession.

112.   As a result thereof, Defendant owed Plaintiff a continuing duty to represent her with the reasonable care, skill and diligence possessed and exercised by attorneys in the State of New York, who practice law in similar circumstances.

113.   The engagement letter implicitly includes the obligations of good faith and fair dealing.

114.   Defendant had a duty to be honest, forthright, truthful, and possessed with ordinary and reasonable skill, diligence and knowledge in fully attending to Plaintiffs' legal matters, but failed to exercise such care, ordinary and reasonable skill, diligence and knowledge which they possessed so as to prevent loss, prejudice and damage to Plaintiff.

115.   As a direct result of the failure of Defendants to perform professional duties and fiduciary obligations properly on behalf of Plaintiff, to honor commitments as attorneys, to perform

and to exercise reasonable care and diligence on behalf of Plaintiff, to provide competent advice, to obtain necessary consents, to appear in Court, to assert and amend claims and causes of action, and to prevent damage to Plaintiff, and in helping themself by taking fees to which they were not properly entitled under the attendant circumstances of their representation of Plaintiff, Plaintiff has sustained and continues to sustain financial loss, prejudice and damage.

116.    The failure of Defendants to act fully and properly on behalf of Plaintiff pursuant to the engagement and in accord with fiduciary obligations as an attorney was due solely and completely to the negligence, carelessness, indifference, and malpractice of Defendants, without any actions of the Plaintiff contributing thereto.

117.    Defendants had a duty at all times to represent Plaintiff fully, properly and completely, but failed to properly use professional knowledge, skill, ability, consciousness and experience in the representation of Plaintiff.

118.    Had Defendants investigated and researched properly, identified causes of action, properly pled and amended pleadings, appeared in Court, and had Defendants properly advised the Plaintiff of her rights, claims, and causes of action, and had commenced and prosecuted such causes of actions in a proper, skillful and diligent manner, they would likely have recovered the monies that Plaintiffs was due, with interest, costs, disbursements and counsel fees.

119.    Defendants breached the engagement letter and were negligent, acted improperly and unskillfully, and departed from good and accepted standards of practice in failing to investigate, research, identify, disclose to the Plaintiff, commence and prosecute causes of action and appear in Court.

120.    Defendants breach of the engagement letter, negligence and malpractice was a proximate cause of the loss sustained by the Plaintiff; "but for" such breach, negligence and

22

malpractice, Plaintiff would not have sustained damages, and would not have incurred additional counsel fees and expenses.

121.    Plaintiff has been damaged in an amount to be determined by the trier of the facts, in the approximate sum of ten million ($10,000,000) dollars.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, in the amount of Ten Million ($10,000,000) Dollars; and the costs and disbursements of this action, and such other relief as to the Court seems just and proper.

Dated:      Massapequa, New York
            May 21, 2012

                                    RUSS & RUSS, P.C.
                                    Attorneys for Plaintiff


                                    By: _____
                                        Jay Edmond Russ, Esq. (JR-2258)
                                        543 Broadway
                                        Massapequa, New York   11758
                                        (516) 541-1014
                                        jayruss@russrusspc.com

23

# Exhibit A

FILED: NEW YORK COUNTY CLERK 12/29/2010
NYSCEF DOC. NO. 1

INDEX NO. 652411/2010
RECEIVED NYSCEF: 12/29/2010

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

————————————————————X
ELENI HENKEL,                         :

               Plaintiff,       :

      -against-                   :

SHERI GELLMAN,                    :            **SUMMONS**

          Defendant, and      :

SGG PARTNERS, LLC,             :

        Nominal Defendant.   :
————————————————————X

**To the above named Defendants:**

     YOU ARE HEREBY SUMMONED to answer the Complaint in this action and to

serve a copy of your answer, or, if the complaint is not served with this summons, to

serve a notice of appearance, on the Plaintiff's attorney(s) within 20 days after the service

of this summons, exclusive of the day of service (or within 30 days after the service is

complete if this summons is not personally delivered to you within the state of New

York); and in the case of your failure to appear or answer, judgment will be taken against

you by default for the relief demanded in the complaint.

Dated:  December 29, 2010
       New York, New York

               COHEN TAUBER SPIEVACK & WAGNER P.C.

               By: _____
                     Stephen Wagner
                     Sari E. Kolatch
                     420 Lexington Avenue, Suite 2400,
                     New York, NY  10170

{00097219.DOC; 1}

(212) 586-5800 (phone)
(212) 586-5095 (fax)
swagner@ctswlaw.com
skolatch@ctswlaw.com
*Attorneys for Eleni Henkel*

To:   Sherri Gellman
37 Calhoun Drive
Greenwich, CT 07831

SGG Partners
16 East 52nd Street
New York, New York 10022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------X

ELENI HENKEL,
     :

          Plaintiff,
     :

        -against-
     :

SHERI GELLMAN,
     :     **VERIFIED COMPLAINT**

          Defendant, and
     :

SGG PARTNERS, LLC,
     :

          Nominal Defendant.
     :

---------------------------------------------------------X

       Plaintiff, Eleni Henkel ("Plaintiff" or "Henkel"), by her counsel, Cohen Tauber

Spievack & Wagner P.C., as and for her complaint against the defendant, Sheri Gellman

("Defendant" or "Gellman"), and nominal defendant SGG Partners, LLC ("SGG

Partners"), alleges as follows:

<u>THE PARTIES, JURISDICTION AND VENUE</u>

     1.    Plaintiff is a resident of Greenwich, Connecticut, and maintains a principal

place of business in the State, City, and County of New York.

     2.    Upon information and belief, Gellman resides in Greenwich, Connecticut,

and maintains a principal place of business in the State, City and County of New York.

     3.    Nominal defendant SGG Partners is a New York Limited Liability

Company.  It was formerly known as SGP/JSY, Inc., a New York corporation ("SGP"),

and has been known in the industry as SG Partners ("SG," along with SGP and its

successor SGG Partners, except where the context otherwise requires, collectively,

1

"SG"). SG maintains a principal place of business at 16 East 52nd Street, New York, New York 10022.

4.      This Court has jurisdiction over Defendant and SGG Partners pursuant to CPLR 302(a)(1), as each transacts business within this state.

5.      Venue is proper in this Court pursuant to CPLR 503(a)(1).

<p align="center">THE FACTS</p>

6.      SG is an executive search firm specializing in the global financial services industry, and provides placement services to hedge funds, private equity firms and investment banks for professionals at every level, from analyst to partner.

7.      Upon information and belief, Defendant founded SG in 1991 with Jennifer Yorke. Upon information and belief, from 1991 to 2009, Gellman and Yorke each owned 50% of the stock of SGP/JSY, and split profits on a 50/50 basis. In or about December 2009, following a protracted dispute between Gellman and Yorke, SGP/JSY was voluntarily liquidated. Gellman remained a principal of the successor SGG Partners entity.

8.      Plaintiff is a graduate of Dartmouth College and the Harvard Business School. Upon graduation from business school, Henkel accepted a position as an Associate in the Investment Banking Division of Morgan Stanley & Co. ("Morgan Stanley"), where she had worked for two years after graduation from college. Henkel remained at Morgan Stanley for an additional 21 years, where she held various positions in the Investment Banking Division, eventually rising to level of Managing Director.

<p align="center">2</p>

{00097809.DOC; 2}

9.     In or about 2001, Henkel was appointed Global Head of the firm's Analyst Program. In this capacity, Henkel was responsible for all aspects of the program including, without limitation, hiring, performance evaluation, and compensation.

10.    Henkel met Gellman and Yorke in 1996 in Greenwich, Connecticut, where they all lived. Although they initially met in a social context, Gellman and Yorke understood that Henkel's experience was invaluable to a firm such as SG. Not only did Henkel have a substantive understanding of the financial services industry, having been a banker for much of her career, but also, as Global Head of Morgan Stanley's analyst program, she was uniquely positioned to identify and evaluate candidates in the financial services industry.

11.    Over a several year period, both Gellman and Yorke regularly suggested to Henkel that she consider leaving Morgan Stanley to join SG. Henkel was not ready to leave Morgan Stanley, where her career was flourishing, and did not seriously entertain their offers to join SG.

12.    By 2007, Henkel had worked at Morgan Stanley for more than 20 years (post business school) and had attained what is considered "full career" status at the bank, causing her to be fully vested in various options and other financial benefits. Accordingly, for the first time, Henkel entertained a career move. Given her experience and qualifications, Henkel had many opportunities available to her and was considering senior positions in both private equity firms and hedge funds.

13.    By this time, the relationship between Gellman and Yorke had soured, and the two were engaged in a bitter feud. Gellman informed Henkel that she and Yorke

3

were terminating their relationship through a buyout of Yorke or through some other business arrangement.

14.     With her split from Yorke pending, Gellman significantly ramped up her efforts to recruit Henkel, calling her regularly both to complain about Yorke and to persuade her to make the move to SG.

15.     Henkel advised Gellman that she would only consider joining SG as an owner (whether as partner, shareholder or member, depending on the corporate structure; for ease of reference, such equity interest will be referred to herein as a partnership interest) and that she was unwilling to join SG as an employee.

16.     Gellman told Henkel that she could not make her a partner while Yorke still had equity in SG, because Yorke would not agree. Gellman continuously assured Henkel, however, that as soon as the separation from Yorke was finalized, Henkel would become, *at a minimum*, Gellman's equal partner in SG. Gellman informed Henkel that she envisioned that Henkel would assume total responsibility for the day to day operations of the entire business, and that Gellman eventually would retire altogether.

17.     Henkel understood that the contentious split between Gellman and Yorke could, and would, drag on for a period of time. Nevertheless, in reliance on Gellman's promise that she would become a partner as soon as Yorke departed SG, Henkel agreed to accept Gellman's offer, and to begin her initial tenure at SG pursuant to a contract for a guaranteed compensation for a period of two years.

18.     To fairly compensate Henkel for the delay in partnership status pending Yorke's departure, and in recognition of the fact that Henkel's agreement to join SG was dependent on the promise of an equity position, Gellman offered to pay Henkel a

4

compensation package which consisted of a base salary and a substantial guaranteed bonus for the 9 months Henkel would work in 2008, and a base salary and an even larger guaranteed bonus in 2009.

19.     In reliance on Gellman's promises regarding partnership, Henkel accepted Gellman's offer to join SG. Henkel resigned from Morgan Stanley in March 2008, and began working at SG the following month.

20.     SG's business is divided into three divisions: (i) the "Junior Business," which handles the placement of candidates who, at the time of placement, are completing their first, second, or third year of employment in an investment bank or management consultant analyst program; (ii) the "Senior Business," which involves the placement of candidates holding an MBA or similar post-graduate degree as associates, vice presidents, principals and managing directors; and (iii) the "Hybrid Business," which places candidates without a post graduate degree who have completed both two or three years in an analyst program and one or two years of work with a private equity fund, hedge fund, or other asset management firm.

21.     When Henkel joined SG in April 2008, she initially was responsible for building SG's Senior Investment Banking Business. Henkel was forced to shift focus to other aspects of SG's business, however, after a series of events occurred that threatened the ongoing success of SG.

22.     First, March 2008 marked the beginning of what was to become a catastrophic economic downturn that included the failure of major investment banks. The failure of those institutions negatively impacted the financial services industry and significantly diminished SG's Senior Business.

5

23.     Second, in January 2009, the person running SG's Junior Business resigned and formed her own competing placement firm, taking with her several key SG employees.  Shortly thereafter, additional SG employees resigned and joined this competing firm.  These defections had a devastating affect on the Junior and Hybrid Businesses, as SG lost several substantial clients to this new competitor.  With the Senior Business decimated by the economic downturn and the Junior and Hybrid Businesses threatened by these defections, Gellman and Henkel both feared for SG's continued viability.

24.     Third, the protracted dispute between Gellman and Yorke created a constant negative distraction that perpetually threatened to undermine Henkel's ability to do her job.  For example, depending on the tenor of the Yorke-Gellman negotiations at any given moment, Yorke would either tell the team working with Henkel that that they should listen to Henkel who was heading up the team, or would tell the staff that they should not follow Henkel's instructions.  Yorke's behavior caused dysfunction and disruption, around which Henkel was constantly required to navigate.

25.     Henkel was left with barely a skeleton staff and virtually no clients.  Because she was to become a partner immediately upon Yorke's departure, Henkel worked diligently to maintain what was left of the business and to develop new clients.  She turned her focus from the Senior Investment Banking Business, which was not viable in the then existing economic climate, to rebuilding and growing the Junior and Hybrid Businesses.

26.     Consistent with her offer of partnership to Henkel, and to highlight the attractiveness of a partnership interest, Gellman provided Henkel all of SG's financial

6

details, including a written history of Gellman and Yorke's W-2 income over the course of their partnership. Gellman also disclosed to Henkel the details of the existing compensation packages of all of the employees, and the details regarding SG's revenue and profitability.

27.     Throughout 2009, Henkel worked tirelessly to restore SG's business. Henkel prepared all of the materials for, and made the presentations at, "pitch meetings" to prospective clients. Gellman occasionally accompanied Henkel to those meetings with prospective clients, but was not otherwise engaged in executing any searches for clients. Henkel also regularly communicated with the clients of the Junior and Hybrid Businesses regarding active and anticipated searches.

28.     As a result of Henkel's ongoing efforts, the Junior Business stabilized, and SG was retained by a major client, which ensured the ongoing viability of SG.

29.     Henkel's employment contract was due to expire at the end of 2009. Given the contentious nature of the dispute between Gellman and Yorke, Henkel was concerned that the dispute would not be resolved by year-end. Henkel reminded Gellman that, pursuant to their agreement, she would only remain at SG after 2009 as a partner in the business, and that if the separation from Yorke was not completed by the end of the year, Henkel would leave SG at the end of 2009 when her employment contract ended.

30.     In the fall of 2009, Gellman told Henkel that the negotiations with Yorke regarding her separation from SG were progressing, and as soon as Yorke left, Henkel would assume her position as partner. Gellman also told Henkel that she would have her attorney draft an agreement that would memorialize the terms of their partnership.

7

31.     Henkel and Gellman refined the major and substantive terms of their partnership agreement, and Gellman worked furiously to finalize her separation from Yorke by the end of the 2009 so that she would not lose Henkel.  The prolonged feud with Yorke had taken its toll on Gellman, and she repeatedly told Henkel, and others, that there was no one other than Henkel that she would go into partnership with, and that if Henkel did not agree to stay past the end of 2009, Gellman would shut down SG after Yorke left.

32.     Gellman admitted to being "battle worn" from the Yorke dispute.  During Henkel's tenure at SG, Gellman had never worked full time, and she made it clear that she had no intention of increasing her activities on behalf of the business after Yorke's departure. To entice Henkel to stay, she informed Henkel that she was interested in retiring, and that over a period of 3 or 4 years Gellman would transition out of the business, leading to, at first, a reduced percentage of the profits each year, and then to a buy-out by Henkel (a position from which Gellman later retreated).

33.     In or about December 2009, Yorke's separation agreement was finalized, and she ceased to be a partner in SG.

34.     With Yorke's departure from SG, Gellman's promise of partnership to Henkel became effective.

35.     Gellman and Henkel entered into an oral contract regarding the terms of the partnership, with the understanding that those terms would later be memorialized in a written partnership agreement or operating agreement, depending upon the ultimate business structure.

8

36.     Given the disruptive events of 2008 and 2009, and the adverse economic conditions, particularly in the financial sector, Henkel and Gellman were concerned that 2010 would not be a profitable year.

37.     Gellman and Henkel agreed that given Henkel's new status as a partner, she, like Gellman, would not receive any salary throughout 2010 (unlike in previous years when she had been an employee), but would instead receive a portion of the return on equity at year-end – i.e., a percentage of the firm's profits. To address the fact that Henkel was responsible for running the business, and with an expectation that profits would be low in 2010, Gellman and Henkel agreed that Henkel would receive the first $500,000; Gellman would receive the next $500,000; and the remainder would be split 50/50 in 2010 and then 60% to Henkel and 40% to Gellman in 2011 and beyond.

38.     In recognition of, and in reliance on, her new status as a partner in SG, Henkel did not receive a base salary during 2010 despite the fact that she actively worked the entire year, and continued to salvage and rebuild the business.

39.     In February 2010, Gellman created a new LLC called SGG Partners as SGG/JSY's successor business entity (although it continued to be known in the industry as SG).

40.     Henkel immediately assumed all of the rights and responsibilities of an owner of SGG Partners. For example, beginning in February 2010, she became a signatory on the new SGG Partners bank account, received a company debit card, and had check writing authority. The only other signatories were Gellman and SGG Partners' outside accountant, who wrote the monthly checks for the company.

9

41.     Gellman and Henkel agreed that compensation, hiring and firing decisions would be made jointly.  Throughout 2010 Gellman and Henkel operated according to this agreement.

42.     Consistent with her partnership role, Henkel indentified candidates for the Junior Business team, conducted all negotiations with the candidates and liaised with company counsel to draft offer letters.  Henkel also was involved in searching for new office space for SGG Partners and, when it appeared that a prospective lease required a guarantee, draft personal guarantees for both Gellman and Henkel were prepared.  SGG Partners ultimately did not enter into the lease in question.

43.     During the first quarter of 2010, Gellman provided Henkel with company invoices and suggested she review the invoices to familiarize herself with SGG Partners' expenses.

44.     In the meantime, Gellman's lawyer drafted bullet points of the key terms of Gellman and Henkel's existing partnership (which was to take the form of membership in the LLC).  Gellman and Henkel approved the key terms and Gellman's attorney drafted the operating agreement of the new LLC reflecting these agreed upon terms.

45.     In 2010, when Gellman accompanied Henkel to pitch meetings, she often referred to Henkel as her partner.

46.     By March 2010, the operating agreement drafted by Gellman's lawyer included all of the significant terms to which Henkel and Gellman had already agreed, and pursuant to which they were already operating.

47.     With just some minor details to be finalized, Henkel continued with her single-minded focus to rebuild the company that she now co-owned.

10

48.     By the summer of 2010, it became clear that under Henkel's management, SGG had performed markedly better than Henkel and Gellman had originally projected.

49.     Upon information and belief, once Gellman realized that SGG Partners was on track for a very profitable year, she decided to breach her agreement with Henkel so that she did not have to split SGG Partners' profits with her new partner.

50.     To accomplish this goal, after having her lawyer stall the process, Gellman began imposing new pretextual conditions on the already existing partnership agreement in an attempt to sabotage it. After agreeing to virtually all of the major terms of the operating agreement, Gellman suddenly proposed new conditions that deviated significantly from the terms to which the parties already had agreed and by which they were already operating.

51.     Specifically, Gellman sought to dilute Henkel's ownership interest in SGG Partners by proposing to provide the employees in the Senior Business with equity interests in the company. This was inconsistent with Gellman's prior agreement that she and Henkel would be the only partners, and that Henkel would receive 60% of the profits as a result of her greater contribution to SGG Partners' management and that they would defer to the future any consideration of distribution of equity interests to SGG employees.

52.     In the summer of 2010, Henkel requested SGG Partners' financial records from the accountant. For the first time, Henkel was informed that, upon Gellman's instruction, Henkel would no longer be permitted to see SGG Partners' financial information.

11

53.     Gellman also demanded that Henkel agree to allocate percentages of revenues to the Junior and Senior Businesses in a manner inconsistent with what she and Henkel had previously agreed.

54.     To date, despite diligent efforts by Henkel, Gellman has refused to sign the operating agreement of their new LLC, has denied Henkel access to her own company's financial information, and has disbursed money in a manner not agreed to by, nor disclosed to, Henkel.  Gellman has also indicated her intention to award bonuses in amounts Henkel has neither consented to nor approved.

55.     Gellman has recently denied that Henkel is a partner in SGG Partners, and refuses to accord Henkel her previously granted partnership rights.

56.     Henkel dedicated the year to rebuilding SGG Partners based on her agreement with Gellman that (i) Henkel and Gellman were partners in SGG Partners; (ii) Henkel would receive the first $500,000, Gellman would receive the next $500,000, and the remaining profits would be split 50/50 the first year, and 60/40 in Henkel's favor in 2011 and beyond; (iii) neither partner would act unilaterally in awarding compensation to SGG Partners' employees; (iv) both partners would approve significant company expenses before they were incurred; and (v) Gellman and Henkel would enter into an operating agreement to memorialize the terms of their agreement.

57.     Gellman has breached the terms of the agreement, and her actions threaten to destroy the company that Henkel worked tirelessly to rebuild.

## AS AND FOR A FIRST CAUSE OF ACTION
(Declaratory Judgment)

58.     Plaintiff repeats and re-alleges all of the allegations set forth in paragraphs 1- 57 as if fully set forth herein.

12

59.    Plaintiff seeks a judicial determination that she is a member of SGG Partners, owns 60% of the equity of SGG Partners, and is entitled to all of the rights accorded a 60% member of SGG Partners.

60.    Gellman has expressly taken the position that Plaintiff is not a member of SGG Partners because the operating agreement has not yet been signed.

61.    A judicial determination is necessary at this time because Gellman has (i) blocked and continues to block Henkel's access to SGG Partners' financial records; (ii) improperly withdrawn money from SGG Partners for her own benefit in contravention of the agreed upon profit sharing arrangement; and (iii) plans to distribute year end compensation packages without Plaintiff's agreement and consent and in an inequitable manner that could result in further defections from the company.

62.    Henkel runs the risk that Gellman's actions will dilute or destroy Plaintiff's ownership interest in SGG Partners, and damage the ability of SGG Partners to continue as a viable entity.

63.    Plaintiff is without any adequate remedy at law.

### AS AND FOR A SECOND CAUSE OF ACTION
(Breach of Contract)

64.    Plaintiff repeats and re-alleges all of the allegations set forth in paragraphs 1- 63 as if fully set forth herein.

65.    In the fall of 2007, Gellman offered Henkel partnership in SG effective upon Yorke's separation from SG, if Henkel would agree to leave Morgan Stanley and join SG.

13

66.    Gellman accepted Henkel's offer and agreed to work as an employee until the end of 2009, provided she was made a partner at the end of 2009, or sooner if Yorke's separation from SG was completed prior to the end of 2009.

67.    Henkel and Gellman had a valid and fully enforceable contract that provided for Henkel to be a 60% partner of SG or its successor entity once Yorke's separation from the company was completed.

68.    Henkel performed her obligations under her agreement with Gellman and resigned her position as Managing Director at Morgan Stanley, declined to entertain other significant career opportunities that were available to her at the time, and went to work for SG.

69.    During her employment at SG in 2008 and 2009, Henkel performed all of her obligations as an employee of SG and was responsible for salvaging the company from its potential demise.

70.    Yorke's separation agreement with SG was finalized in December 2009.

71.    Gellman has breached the agreement by denying Henkel her partnership in SGG Partners and claiming that she is only an employee.

72.    Henkel has been damaged as a result of Gellman's breach in an amount to be determined at trial, but in no event less than $20,000,000.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Breach of Contract)

73.    Plaintiff repeats and re-alleges all of the allegations set forth in paragraphs 1- 72 as if fully set forth herein.

{00097809.DOC; 2}

14

74.   Gellman promised that if Henkel remained at SG at the conclusion of her employment contract, she would be a partner in SG and the successor entity, SGG Partners, that was formed in 2010.

75.   Gellman further promised Henkel that (i) in 2010, Henkel would receive the first $500,000, Gellman would receive the next $500,000, and the remaining profits would be split 50/50; (ii) in 2011 and beyond Henkel would get 60% of the profits; (iii) neither partner would act unilaterally in awarding compensation to SGG Partners' employees; (iv) both partners would approve significant company expenses before they were incurred; and (v) Gellman and Henkel would enter into an operating agreement to memorialize the terms of their agreement.

76.   Henkel accepted Gellman's offer and performed all of her obligations under the agreement, worked tirelessly to run the business of SGG Partners, and not only salvaged the company but also substantially increased its profitability.

77.   Henkel and Gellman had a valid and fully enforceable agreement.

78.   Gellman has breached her obligations under the agreement by (i) refusing to recognize Henkel's partnership in SGG Partners; (ii) acting, or threatening to act unilaterally in awarding compensation to SGG Partners' employees; (iii) blocking Henkel's access to SGG Partners' financial records; (iv) refusing to enter into a written operating agreement; (v) making improper payments to herself or for her own benefit from the SGG Partners account without Henkel's knowledge or consent; and (vi) refusing Henkel her rightful share of SGG Partners' profits.

79.   Henkel has been damaged as a result of Gellman's breach in an amount to be determined at trial, but in no event less than $20,000,000.

15

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Accounting)

80.     Plaintiff repeats and re-alleges all of the allegations set forth in paragraphs 1- 79 as if fully set forth herein.

81.     As a member and owner of SGG Partners, Henkel is entitled to access to all of the financial books and records of SGG Partners.

82.     Despite reasonable, frequent and adequate demand, Gellman has refused to provide Henkel with access to SGG Partners' books and records.

83.     Gellman has demanded that Henkel provide her with input regarding compensation of SGG Partners' employees, but has refused to provide Henkel with the financial information upon which such a determination must be based.

84.     Henkel is entitled to an accounting from Gellman to determine SGG Partners' revenue for 2010 and to determine what distributions or payments SGG Partners has made during the year.

85.     Henkel requires a full accounting of (i) fees SGG Partners received from its clients during 2010 (whether the payment was made to SGG Partners or its predecessor entity), including information sufficient to show into which account each such fee was deposited; (ii) every payment or wire transfer made by SGG Partners in 2010, including identification of the recipient and purpose of such payment or transfer, including, without limitation, all back up documents, such as invoices and receipts.

86.     Henkel has no adequate remedy at law.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Promissory estoppel)

16

87.     Plaintiff repeats and re-alleges all of the allegations set forth in paragraphs 1- 86 as if fully set forth herein.

88.     Gellman explicitly promised Henkel that if she left Morgan Stanley and came to work for SG, she would be a partner as soon as Yorke left SG.

89.     In reliance on this promise, Henkel resigned her position as Managing Director at Morgan Stanley, did not pursue other available career opportunities, and accepted an employment position with SG through the end of 2009, the time frame within which it was anticipated that Yorke's separation from SG would be finalized.

90.     Yorke's separation from the business was complete in December 2009.

91.     Gellman explicitly promised Henkel that (i) she was a partner in the business as of January 2010; and (ii) she would receive guaranteed compensation of $500,000 at the end of 2010, Gellman would receive the next $500,000 in distributable profits, and the remaining distributable profits would be split 50/50 in 2010, and 60/40 for 2011 and beyond.

92.     In reliance on Gellman's promise, Henkel remained at SG after her employment contract expired in December 2009 and worked diligently to rebuild and develop the business into the successful and profitable company that SGG Partners is today.

93.     Gellman was aware that Henkel exclusively relied on Gellman's promise of partnership when deciding to leave Morgan Stanley and accept work as an employee at SG.

94.     Gellman was aware that Henkel's decision to stay at SG following the expiration of her employment contract was made exclusively in reliance on Gellman's

17

promise that Henkel was a partner in SG (or the new entity that would be created) and would own at least 60% of the equity of said entity.

95. Gellman now denies that Henkel is a partner in SGG Partners, in breach of her express and unambiguous promises to Henkel upon which Henkel relied and acted.

96. As a result of Gellman's breach of her promises, Henkel has been damaged in an amount to be determined at trial, but in no event less than $20,000,000.

### AS AND FOR A SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

97. Plaintiff repeats and re-alleges all of the allegations set forth in paragraphs 1-96 as if fully set forth herein.

98. In reliance on Gellman's promise of partnership, Henkel left her position as Managing Director at Morgan Stanley and remained at SG after her initial employment contract expired in December 2009, in exchange for a 60% equity position in SGG Partners.

99. In reliance on Gellman's promise that she was a partner and would have at least 60% of the equity in SGG Partners, Henkel worked diligently to rebuild and develop the business into the successful and profitable company that SGG Partners is today.

100. Gellman has profited substantially from the value that Henkel, through her business acumen and tireless efforts, created for the company.

101. By virtue of the foregoing, Gellman has been unjustly enriched.

102. Henkel is entitled to all of SGG Partners' profits obtained by Gellman that properly belong to Henkel, an amount to be determined at trial.

WHEREFORE Plaintiff seeks the following relief:

18

A.  On the First Cause of Action, for a judicial declaration that Eleni Henkel is a member of SGG Partners, owns 60% of the equity, and is entitled to all of the rights accorded a 60% member of SGG Partners;

B.  On the Second Cause of Action, awarding Plaintiff damages, plus interest thereon, in an amount to be determined at trial, but in no event less than twenty million dollars ($20,000,000);

C.  On the Third Cause of Action, awarding Plaintiff damages, plus interest thereon, in an amount to be determined at trial, but in no event less than twenty million dollars ($20,000,000);

D.  On the Fourth Cause of Action, providing Plaintiff access to all of the financial books and records of SGG Partners;

E.  On the Fifth Cause of Action, awarding Plaintiff damages, plus interest thereon, in an amount to be determined at trial, but in no event less than twenty million dollars ($20,000,000);

F.  On the Sixth Cause of Action, awarding Plaintiff damages, plus interest thereon, in an amount to be determined at trial;

G.  Granting Plaintiff pre-judgment interest on all of the amounts awarded at the maximum rate prescribed by law; and

H.  For any other relief that this Court deems just and proper, including recovery of costs, disbursements and attorneys fees.

Plaintiff requests a trial by jury.

Dated:  December 29, 2010
        New York, New York

COHEN TAUBER SPIEVACK & WAGNER P.C.

19

{00097809.DOC; 2}

By:  _____
     Stephen Wagner
     Sari E. Kolatch
     420 Lexington Avenue, Suite 2400,
     New York, NY 10170
     (212) 586-5800 (phone)
     (212) 586-5095 (fax)
     swagner@ctswlaw.com
     skolatch@ctswlaw.com
     *Attorneys for Eleni Henkel*

20

<u>VERIFICATION</u>

STATE OF FLORIDA     )
                         ) ss.:
COUNTY OF INDIAN RIVER )

ELENI HENKEL being duly sworn, deposes and says:

I am the plaintiff herein.

I have read the annexed Verified Complaint, know the contents thereof, and the same is true to be the best of my knowledge, except as to those matters therein which are stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

_____

Eleni Henkel

Sworn to before me this
_29_ day of December 2010

_____
Notary Public

Notary Public State of Florida
Kathleen Marupo
My Commission DD567040
Expires 02/27/2013

# Exhibit B

FILED: NEW YORK COUNTY CLERK 04/19/2011

NYSCEF DOC. NO. 264

INDEX NO. 652411/2010

RECEIVED NYSCEF: 04/19/2011

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _____ BERNARD J. FRIED _____       PART  60

*Justice*

| | | |
|---|---|---|
| ELENI HENKEL, | INDEX NO. | 652411-2010 |
| Plaintiff(s), | | |
| | MOTION DATE | _____ |
| - v - | MOTION SEQ. NO. | 001 |
| SHERI GELLMAN, ET AL., | | |
| Defendant(s). | MOTION CAL. NO. | _____ |

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

**Cross-Motion:**  ☐ Yes  ☐ No

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

Plaintiff Eleni Henkel moved for a preliminary injunction and temporary restraining order ("TRO") against defendant Sheri Gellman and SGG Partners, LLC ("SGG"). In this motion, Henkel sought to enjoin Gellman from interfering with Henkel's management of the day-to-day operations of the junior business of SGG. On February 8, 2011, I issued an oral order directing certain discovery and further directing that Henkel's employment should not be terminated pending an evidentiary hearing on April 7, 2011. On that date, this matter was set down for argument and live testimony by the two principals. I received affidavits from the principals in place of their direct examination, but each of them appeared live for cross-examination.

A party seeking a preliminary injunction pursuant to CPLR § 6301 must show: "(1) a likelihood of success on the merits, (2) irreparable injury if provisional relief is not granted, and (3) that the equities are in his favor." **J.A. Preston Corp. v. Fabrication Enterprises, Inc.**, 68 N.Y.2d 397, 406, 502 N.E.2d 197, 509 N.Y.S.2d 520 (1986). Here, both sides have agreed that the only issue before me is the likelihood

1

of success on plaintiff's claim that there was an oral partnership agreement between Henkel and Gellman.

The basis of Henkel's motion is the contention that she is co-owner and partner, with Gellman, in SGG, and not merely an employee of SGG with management responsibilities. To provide a little history: SGG is the successor company to SGP/JSP (hereinafter, "the business"), an executive search business for the financial services industry started by Gellman and her former partner, Jennifer Yorke. SGG Partners was created by Gellman in February 2010, after her split with Yorke was finalized.

Henkel averred that she quit her position at Morgan Stanley in March 2008 to join Gellman at SG Partners, on the condition that she be made a partner. At that time, Gellman was in the process of finalizing her business separation from Yorke, her business partner of about 18 years. Gellman told Henkel that she would make Henkel a partner after the split was finalized. Meanwhile, Henkel was in charge of the "junior side" of the business, *i.e.*, the recruitment of junior-level personnel for financial services companies.

Henkel was paid $1.2 million in salary and bonus for her eight months of work in 2008 alone, and $1.5 million guaranteed in 2009. Henkel testified that she agreed to leave Morgan Stanley and join Gellman's business, in part, because of the generous compensation package, which would compensate her in case Yorke never left the business and she could not become a partner.

Henkel insists that the parties agreed that Henkel would become partner upon Yorke's departure, and that beginning in 2010, they operated as if she already was Gellman's partner, while they negotiated the terms of their written partnership agreement.

In support of Henkel's contention, she has produced evidence that Gellman made her privy to details of her negotiations with Yorke to terminate their partnership, and that Henkel and Gellman discussed the terms of their prospective partnership throughout 2009.

The separation between Gellman and Yorke was finalized at the end of 2009. Henkel testified that, by the end of 2009, she and Gellman had orally agreed upon such terms of their prospective partnership, such as management responsibilities, sharing profits, and jointly making hiring and firing decisions. Meanwhile, the business's revenues had dropped since 2007, and there was a serious question by the end of 2009 whether it would be able to continue in business. Henkel and Gellman orally agreed that neither would receive a salary in 2010, but at the end of the year, Henkel would receive the first $500,000, Gellman the second $500,000, and the remainder be split between them. Henkel testified

2

that Gellman personally guaranteed that Henkel would receive $500,000 in 2010, even if the business suffered a loss. Henkel testified that they did not, by the end of 2009 or at any later time, reach agreement on issues relating to how they would run the business, its budget, and its technology expenditures. They did not even discuss employee compensation before 2010: whether they would permit senior employees to acquire stock in the business, or what would happen if one of them left the business, or what would happen if the two of them had a disagreement about running the business.

Henkel averred that the pair began to function as partners immediately in 2010: Henkel no longer received a salary, as they had agreed; Henkel participated with Gellman in discussions with an outside accountant over employee medical insurance; Henkel's name was attached to the signature page to a personal guarantee on a potential new office lease (never signed); Henkel became a signatory on the bank account, received a company debit card, and had check writing authority; and Gellman often referred to Henkel as her partner. When Henkel filled out the signature card for the business's bank account in early 2010, she handwrote "partner" as her occupation.

It is undisputed that ultimately the parties failed to execute a written partnership agreement, and negotiations halted by the end of September 2010.

According to Henkel, the fact that the parties failed to reach agreement on and execute a written partnership agreement should not make a difference, because they had reached an oral agreement on the essentials of their partnership.

Gellman acknowledges that she and Henkel discussed the possibility of Henkel becoming her partner in the business at the time Henkel left Morgan Stanley and in early 2010. Gellman testified credibly that, because her separation from Yorke had been complicated by the fact that they never had a written partnership agreement, she told Henkel more than once that she was unwilling to enter into another unwritten partnership agreement with Henkel. Henkel and Gellman were both represented by separate counsel in the negotiation of their written partnership agreement during 2010. Gellman testified that, despite nine months of negotiation through counsel, she and Henkel were unable to reach agreement on such issues as employee compensation, senior employees acquiring stock in the business, the need for employees to sign confidentiality agreements, and what would happen if Henkel stopped working for the company. In June 2010, Gellman conditioned allowing Henkel to view the company's financials on Henkel's signing a confidentiality agreement, which Henkel refused to sign. Although a draft Operating Agreement was

3

prepared by Gellman's lawyer and circulated to Henkel, it was never executed.

Gellman testified that she was unaware that Henkel wrote "partner" as her occupation on her signature card for the business's bank account in early 2010. Henkel admitted on cross-examination that she never told Gellman that she had done so, and Gellman had not been present when she filled out the form.

In support of her version of the story, Gellman has submitted emails from the end of 2009 and early 2010, which call into question Henkel's testimony that the pair had reached a partnership agreement at the end of 2009. These include emails from December 27, 2009, in which Henkel indicates she is aware of the possibility that she might not be made a partner Gellman also submitted a written memorandum prepared as part of the 2010 partnership negotiations between Henkel and Gellman, which provides that it "represents certain non-legally binding understandings" between Henkel and Gellman, and that the parties "intend to draft and negotiate an Operating Agreement which will be legally binding." This memorandum was circulated by Gellman's lawyer at the end of January 2010. Gellman produced emails exchanged between the parties or their attorneys during the Spring and Summer 2010, which continue to indicate that the parties did not yet have a written partnership agreement. Henkel testified that she did not raise any objections to or question these email indications that the parties had not yet reached a final agreement.

"For a contract to be created, . . . there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Thome v. Alexander & Louisa Calder Foundation*, 70 A.D.3d 88, 103-04 (1st Dept. 2009) (internal quotations omitted). Moreover, "[w]hen parties do not intend to be bound until their agreement is reduced to writing and signed, there is no contract in the interim, even if the parties have orally agreed upon all the terms of the proposed contract." *Chatterjee Fund Mgmt, L.P. v. Dimensional Media Assocs.*, 260 A.D.2d 159, 159 (1st Dept. 1999) (internal citation omitted).

Based on the credible evidence before me, I conclude that Henkel is unlikely to succeed on her claim that she and Gellman entered into an enforceable partnership agreement. To the contrary, the credible evidence indicates that Gellman recruited Henkel to the business in 2008, based on a generous compensation package and in the mutual hope that the two would eventually become partners in the business. To that end, Henkel and Gellman engaged in partnership negotiations for the first nine months of 2010, through their respective counsel, concerning the terms of their Operating Agreement. I

credit Gellman's testimony that she told Henkel repeatedly that she would never make the mistake of entering into an oral partnership agreement, as she had done with Yorke. I am persuaded by the ample documentary evidence produced by Gellman indicating that both parties were aware that they were negotiating a written partnership agreement, of which they had not yet reached agreement on all of the material terms. Although Henkel agreed to a reduced salary of $500,000 for 2010, in light of the poor economic economic forecast for 2010 and the fact that Gellman personally guaranteed Henkel that amount of salary, I do not find this fact convincing evidence that the pair had reached a partnership agreement to share profits and losses. Likewise, Henkel's management responsibilities and becoming a signatory on the business bank account are consistent with Henkel's management of the junior side of the business and Gellman's testimony that she anticipated that the two would be able to hammer out a partnership agreement in 2010. The fact that Henkel called herself "partner" on the signature card of the bank account in early 2010 does not controvert Gellman's testimony that the two anticipated Henkel becoming partner with the execution of the Operating Agreement, which was currently being negotiated. The case of *Richbell Information Services, Inc. v. Jupiter Partners, L.P.*, 309 A.D.2d 288 (1st Dept. 2003), the joint venture case on which plaintiff relies heavily, is factually distinguishable and does not compel a different conclusion.

Finally, I decline to exercise my discretion to admit into evidence for this motion the document entitled "2010 Summary of Plan Description for SGG Partners, LLC 401(k) Plan," and the accompanying affidavits, which was submitted by Henkel's counsel by letter dated April 13, 2011, long after briefing had been completed and after the record had been closed. If I did consider these additional documents, I would then also consider the responsive affidavits submitted by Gellman's counsel by letter dated April 14, 2011, which effectively refute the evidence offered by Henkel. Therefore, this evidence, even if it were admitted, would not change the result on this motion.

Accordingly, it is

ORDERED that the order issued on February 8, 2011 concerning Henkel's employment is hereby dissolved, and Motion Seq. No. 001 is denied in its entirety; and it is further

ORDERED that oral argument on Motion Seq. No. 002 shall take place on May 17, 2011 at 11:30 a.m.

Dated: _____4/18/2011_____

HON. BERNARD J. FRIED

Check one:   ☐ FINAL DISPOSITION   ☒ NON-FINAL DISPOSITION

Check if appropriate:   ☐ DO NOT POST   ☐ REFERENCE

6

Exhibit B2

FILED: NEW YORK COUNTY CLERK 05/18/2011
NYSCEF DOC. NO. 268

INDEX NO. 652411/2010
RECEIVED NYSCEF: 05/18/2011

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _____BERNARD J. FRIED_____        **E-FILE**        PART __60__

~~HON. BERNARD J. FRIED~~        *Justice*

ELENI HENKEL,

                INDEX NO.        652411-2010

                Plaintiff(s),

                MOTION DATE        _____

            - v -

                MOTION SEQ. NO.        ____002____

SHERI GELLMAN, ET AL.,

                Defendant(s).

                MOTION CAL. NO.        _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

                                    PAPERS NUMBERED

Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ...        _____

Answering Affidavits — Exhibits _____        _____

Replying Affidavits _____        _____

**Cross-Motion:**  ☐ Yes  ☐ No

> *MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):*

    Defendants Sheri Gellman and SGG Partners, LLC ("SGG") move to dismiss the complaint filed by plaintiff Eleni Henkel, pursuant to CPLR 3211(a)(1), (5), and (7). The complaint lists six causes of action: (1) a declaratory judgment that plaintiff is a member of SGG with 60% ownership of its equity, (2) breach of an oral partnership contract in Fall 2007, (3) breach of an oral partnership contract at the end of 2009, (4) an accounting of SGG's books and records, (5) promissory estoppel, and (6) unjust enrichment.

    On a motion to dismiss, the facts pleaded in the complaint are presumed to be true and accorded every favorable inference, but "allegations consisting of bare legal conclusions, as well as factual claims inherently incredible or flatly contradicted by documentary evidence are not entitled to such consideration." *Caniglia v. Chicago Tribune-N.Y. News Syndicate*, 204 A.D.2d 233, 233-234 (1st Dept. 1994). In addition, "[t]he motion must be denied, if from the pleadings' four corners, factual allegations are discerned which taken together manifest any cause of action cognizable at law." *Richbell Info. Servs, Inc. v. Jupiter Partners, L.P.*, 309 A.D. 2d

1

288, 289 (1st Dep't 2003).

Dismissal based on documentary evidence under C.P.L.R. §§ 3211(a)(1) is proper when documents relied upon "definitively dispose of [the] plaintiff's claim." *Bronxville Knolls, Inc. v. Webster Town Center Partnership*, 221 A.D.2d 248, 248 (1st Dept. 1995). In assessing a motion under C.P.L.R. § 3211(a)(7), a court may freely consider affidavits submitted by the plaintiff to remedy any defects in the complaint. *Rovello v. Orofino Realty Co.*, 40 N.Y.2d 633, 635 (1976). "The criterion is whether the proponent of the pleading has a cause of action, not whether he has stated one." *Leon v. Martinez*, 84 N.Y.2d 83, 88 (1994) (internal quotation omitted).

Some of the background of this case has been discussed in a previous decision on the preliminary injunction motion.

Plaintiff alleges in her complaint that, March 2008, she left her employment at Morgan Stanley & Co. to accept a 21-month employment contract with SGG, on the strength of Gellman's promise to make her a partner of SGG, as soon as Gellman's then-partner, Jennifer Yorke, left the company.[1] At that time, Gellman was in the process of finalizing her business separation from Yorke, her business partner of close to twenty years. Gellman told Henkel that she would make Henkel a partner after the split was finalized.

Plaintiff began her employment at SGG April 2008, under an employment contract that provided for a salary and guaranteed bonus for her eight months of work in 2008, and a salary and an even larger bonus guaranteed for 2009.

The separation negotiations between Gellman and Yorke were protracted. Plaintiff told Gellman in 2009 that she would leave SGG at the end of her employment contract at the end of 2009 if Yorke had not left by then and if she did not then become a partner. (Compl. ¶ 29.)

Gellman and Yorke's business separation was finalized at the end of 2009. The complaint concludes: "[w]ith Yorke's departure from SG[G], Gellman's promise of partnership to Henkel became effective." (Compl. ¶ 34.) The parties entered into an oral contract regarding the terms of the partnership, which apparently included

---

[1]

SGG is the successor company to SGP/JSP, an executive search business for the financial services industry started by Gellman and her former partner, Jennifer Yorke. SGG Partners was created by Gellman in February 2010, after her split with Yorke was finalized. For simplicity, it will be referred to as SGG in this decision.

the terms that plaintiff would receive the first $500,000 in profits in 2010, Gellman would receive the next $500,000, and the remainder of SGG's profits would be split between them. (Compl. ¶ 37.)

The complaint further alleges that, in February 2010, plaintiff became a signatory on SGG's new bank account, received a SGG debit card, and had check writing authority. (Compl. ¶ 40.) Also during 2010, Henkel and Gellman made hiring and firing decisions jointly. (Compl. ¶¶ 41-42.) Draft personal guarantees (never signed) for a prospective lease for SGG were prepared for both Henkel and Gellman. (Compl. ¶ 42.) Gellman showed Henkel SGG invoices so that she could familiarize herself with SGG's expenses. (Compl. ¶ 43.) Gellman's lawyer drafted bullet points of the key terms of Gellman and Henkel's partnership; upon approval by the principals, the attorney drafted an operating agreement (never signed) of the new LLC reflecting these terms. (Compl. ¶¶ 44, 46.) Gellman referred to Henkel as her partner. (Compl. ¶ 45.)

Plaintiff alleges that in the summer of 2010, Gellman decided to breach her oral agreement with Henkel, in order to avoid having to split SGG's profits with Henkel. Accordingly, in the course of their negotiations, Gellman proposed new terms for the written partnership agreement that deviated significantly from the previously understood terms. (Compl. ¶ 50.) Gellman also refused to sign the operating agreement and reversed course in other ways: no longer asking for Henkel's approval of bonus awards and disbursements of money and denying Henkel access to SGG's financial information, which she had previously shared with her. (Compl. ¶¶ 51-54.)

"It is well settled that, if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed." *Scheck v. Francis*, 26 N.Y.2d 466, 469-70 (1970). This is true "even if the parties have orally agreed upon all the terms of the proposed contract." *Chatterjee Fund Mgmt, L.P. v. Dimensional Media Assocs.*, 260 A.D.2d 159, 159 (1st Dept. 1999) (internal citation omitted).

Since the parties indisputably were actively negotiating a written partnership agreement during 2010, I am bound to conclude that any oral understandings that Henkel would be made a partner were not binding upon the parties until that written agreement had been signed. To the extent that *Keen v. Jason* 19 Misc. 2d 538 (Sup.

3

Ct. 1959), *aff'd,* 11 A.D.2d 1039 (2d Dep't 1960), differs from the *Chatterjee* rule, it is no longer good law, at least in the First Department.

Plaintiff tries to distinguish *Chatterjee* because there the alleged partners were not acting as partners, whereas, according to her, she and Gellman were acting as partners from the beginning of 2010. Although the complaint makes various allegations that are supposedly indicia of an oral partnership agreement already in progress, (*e.g.*, Compl. ¶¶ 40-45), these allegations do not urge the conclusion that the parties were acting as partners; they are consistent with the parties' anticipating that Henkel would be made a partner while actively negotiating the terms of a written partnership agreement.

In this case, even plaintiff concedes that the parties had not orally agreed upon *all* of the terms of the proposed written contract; she contends only that the most important terms had been agreed upon orally. According to the complaint, the "key terms of Gellman and Henkel's existing partnership" were set forth in "bullet points" drafted by Gellman's lawyer, circulated to the parties. (Compl. ¶ 44.) The complaint says very little else about the actual terms of the alleged oral partnership contract to which Gellman and Henkel allegedly orally agreed either in Fall 2007 or late 2009.

The memorandum containing these "key terms" of the alleged oral partnership agreement has been submitted by defendants. This document states: "This memo is not legally binding. Sheri and Eleni intend to draft and negotiate an Operating Agreement which will be legally binding." Plaintiff insists that this document may not be considered on a motion to dismiss based on documentary evidence, because it is a bullet-point memorandum attached to an email. Plaintiff does not, however, deny that this is the very bullet-point memorandum to which the complaint refers. While my decision does not depend on a consideration of this document, the fact that this supposed statement of the "key terms of Gellman and Henkel's existing partnership," (Compl. ¶ 44), expressly indicates that the parties anticipated drafting a written agreement, further supports my conclusion that any alleged oral agreement is unenforceable under New York law.

Consequently, the first four causes of action are dismissed.

The fifth cause of action for promissory estoppel is also dismissed. As plaintiff has acknowledged, a claim for promissory estoppel must allege "a promise

4

clear and unambiguous on its terms, reasonable and foreseeable reliance, and injury caused by his reliance." *Urban Holding Corp. v. Haberman*, 162 A.D.2d 230, 231 (1st Dep't 1990). Plaintiff, who by 2008 had reached "full career" status at Morgan Stanley and was entertaining a career move, negotiated a compensation package with a salary and guaranteed bonus as part of her 21-month employment agreement with SGG. (Compl. ¶¶ 12, 18.) Any statement by Gellman that she intended to make Henkel a partner when Yorke left was necessarily conditioned on conditions and variables outside of either party's control; it is not the sort of clear and unambiguous promise on which a promissory estoppel claim can be based. Indeed, a Harvard Business School graduate with 23 years of experience at Morgan Stanley & Co., (Compl. ¶ 8), plaintiff was too sophisticated reasonably to have relied on the promise she alleges here.

I also dismiss the sixth cause of action for unjust enrichment, without prejudice. "[U]njust enrichment is not an appropriate remedy for recovery of the expenses of a failed negotiation." *Chatterjee*, 260 A.D.2d at 160.

Defendant also moves to dismiss based on the statute of frauds. I need not reach this issue, because all of the counts have been dismissed on other grounds.

Accordingly, it is

ORDERED that defendants' motion to dismiss this action is granted; plaintiff has leave to make any appropriate motion for leave to replead, attaching an affidavit of merit, as required in the First Department.

Dated:  5/17/2011

_____
J.S.C.

HON. BERNARD J. FRIED

Check one:   ☐ FINAL DISPOSITION   ☒ NON-FINAL DISPOSITION
Check if appropriate:   ☐ DO NOT POST   ☐ REFERENCE

5

# Exhibit C

INDEX NO. 652411/2010
FILED: NEW YORK COUNTY CLERK 09/22/2011

NYSCEF DOC. NO. 270                                                    RECEIVED NYSCEF: 09/22/2011

## SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:      BERNARD J. FRIED          E-FILE      PART __60__

HON. BERNARD J. FRIED          _Justice_

| ELENI HENKEL, | | |
|---|---|---|
| | INDEX NO. | __652411-2010__ |
| Plaintiff(s), | | |
| | MOTION DATE | _____ |
| - v - | | |
| | MOTION SEQ. NO. | _____ |
| SHERI GELLMAN, ET AL., | | |
| Defendant(s). | MOTION CAL. NO. | _____ |

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

**Cross-Motion:** ☐ Yes   ☐ No

At the scheduled court conference on September 22, 2011, plaintiff failed to appear. Accordingly, and in accordance with my Order dated July 21, 2011, it is

ORDERED that this action is dismissed with prejudice, pursuant to 22 NYCRR § 202.27 and Rule 12 of the Rules of the Commercial Division of the Supreme Court, 22 NYCRR 202.70.

Dated: __9/22/2011__

J.S.C.

HON. BERNARD J. FRIED

Check one:  ☒ FINAL DISPOSITION   ☐ NON-FINAL DISPOSITION

Check if appropriate:     ☐ DO NOT POST     ☐ REFERENCE

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):

1

# Exhibit D

INDEX NO. 109956/2011

FILED: NEW YORK COUNTY CLERK 02/10/2012

NYSCEF DOC. NO. 47

RECEIVED NYSCEF: 02/10/2012

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT: HON. BERNARD J. FRIED                    E-FILE                    PART 60

_____
                          **Justice**

Index Number : 109956/2011                                        INDEX NO. 109956/11

GELLMAN AND SGG PARTNERS                                MOTION DATE _____

vs.

HENKEL, ELENI                                                        MOTION SEQ. NO. 002

SEQUENCE NUMBER : 002

DISMISS                                      _____

The following papers, numbered 1 to _____ , were read on this motion to/for _____

Notice of Motion/Order to Show Cause — Affidavits — Exhibits  _____  | No(s)._____

Answering Affidavits — Exhibits _____  | No(s). _____

Replying Affidavits _____  | No(s). _____

Upon the foregoing papers, it is ordered that this motion is

<div style="transform: rotate(-90deg)">MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):</div>

      ORDERED, that this motion to dismiss is GRANTED in part and the First, Second, Third and Fourth Counterclaims are DISMISSED; and the motion to dismiss is DENIED in part, with regard to the Fifth Counterclaim;

in accordance with the proceedings held on February 7, 2012.

          SO ORDERED

Dated: 2/8/2012                                          _____, J.S.C.

                                                HON. BERNARD J. FRIED

1. CHECK ONE: ................................................. ☐ CASE DISPOSED        ☒ NON-FINAL DISPOSITION

2. CHECK AS APPROPRIATE: ....................MOTION IS: ☐ GRANTED  ☐ DENIED  ☒ GRANTED IN PART  ☐ OTHER

3. CHECK IF APPROPRIATE: ................................................. ☐ SETTLE ORDER        ☐ SUBMIT ORDER

                                                ☐ DO NOT POST  ☐ FIDUCIARY APPOINTMENT  ☐ REFERENCE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELENI HENKEL,

                      Plaintiff,

    -against-

STEPHEN WAGNER and COHEN TAUBER
SPIEVACK & WAGNER, P.C.,

                    Defendants.

## COMPLAINT

# Russ & Russ, p.c.

*Attorneys for*   PLAINTIFF

*Office and Post Office Address, Telephone*
**543 Broadway**
**P.O. Box 149**
**Massapequa, NY 11758-5009**
**(516) 541-1014 • FAX (516) 541-1077**