UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAR 2 9 2016
```

Eleni Henkel,

                    Plaintiff,

          –v–

Stephen Wagner, et al.,

                    Defendants.

12-cv-4098 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

Plaintiff Eleni Henkel brings this legal malpractice suit against Stephen Wagner and Cohen Tauber Spievack & Wagner, P.C. ("Defendants"), the attorney and law firm that represented her in a dispute over her employment relationship with SGG Partners, LLC, an executive search firm for which she worked. Henkel alleges that Defendants' failure to attend two state-court conferences in that dispute resulted in the judge dismissing her case with prejudice. This dismissal, Henkel argues, prevented her from bringing certain counterclaims against SGG Partners and its principal, Sheri Gellman, in a subsequent action.

To prevail on a legal malpractice claim in New York, a plaintiff must demonstrate that her attorney was negligent, that the negligence was the proximate cause of a loss, and that she suffered actual damages. *See Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006). Defendants have moved for summary judgment solely on the basis of the second prong of this inquiry, arguing that Henkel has failed to show that she would have prevailed on her counterclaims, and thus that she has failed to demonstrate that any negligence on Defendants' part proximately caused a loss. Defendants have also moved to preclude the testimony of an expert that Henkel has put forward on the issue of damages, and Henkel has likewise moved to preclude two of Defendants' experts. For the reasons that follow, Defendants'

1

motion for summary judgment is GRANTED in part and DENIED in part, Defendants' motion to preclude is DENIED, and Henkel's motions to preclude are both DENIED.

## I.     BACKGROUND

### A.     Factual Background[1]

The issues at the core of this case relate to an employment dispute between Eleni Henkel and Sheri Gellman, who worked together in the executive search industry.  In February 2008, Henkel accepted a job at SGP/JSY, Inc., an executive search business that specialized in personnel placement within the financial industry.  Pl. 56.1 CS ¶¶ 25-26.  Gellman was a principal at SGP/JSY and was in the process of finalizing her separation from her longstanding business partner when Henkel was hired.  Proscia Decl., Dkt. No. 123, Ex. A. ("Amended Compl.") at Ex. B ("Prelim. Inj. Op.") at 2.  Prior to joining SGP/JSY, Henkel had worked at Morgan Stanley & Co. for more than twenty years and had served as Global Head of the company's Analyst Program.  Pl. 56.1 CS ¶¶ 21, 23.  Pursuant to the agreement she signed with SGP/JSY ("the Employment Agreement"), Henkel was to begin working at the firm by June 2008, and her employment was to continue through December 31, 2009.  *Id.* ¶¶ 27.  The Employment Agreement specified that Henkel's employment was "at will," but she was guaranteed to receive at least $2,700,000 in compensation for the time period covered by the agreement.  *Id.* ¶ 28, 30; *see also* Proscia Decl., Dkt. No. 123, Ex. K at 1.

SGP/JSY was voluntarily liquidated in or about December 2009.  Pl. 56.1 CS ¶ 38.  Another executive search firm, SGG Partners, LLC, was formed in February 2010 as a successor entity to SGP/JSY.  *Id.* ¶¶ 39-40, 42.  Gellman served as the sole member of SGG Partners, and Henkel continued to work with her at this new entity.  *Id.* ¶¶ 41, 43.  According to Henkel's testimony from previous litigation, her responsibilities included identifying candidates for the "Junior Business division" at SGG Partners, conducting negotiations with those candidates, and

---

[1] Unless otherwise noted, the facts described herein are undisputed.  The Court relies principally on the facts set forth in Plaintiff's Response to Defendants' Local Rule 56.1 Statement ("Pl. 56.1 CS").  *See* Dkt. No. 151.

serving as the direct supervisor for all Junior Business division employees. *Id.* ¶¶ 33-34.  Henkel also testified to having signatory authority on SGG Partners' corporate bank account and to receiving an SGG Partners corporate debit card. *Id.* ¶¶ 36-37.  In this action, Defendants have not disputed this testimony. *See id.* ¶¶ 33-34, 36-37; Defs. Br. 4-5.

After SGP/JSY was liquidated, and Henkel began working for SGG Partners, her employment was no longer governed by a written agreement. *Id.* ¶ 44.  The exact terms of Henkel's working relationship with SGG Partners and Gellman—specifically Henkel's compensation and whether she was a partner—were, and remain, in dispute.  As to compensation, Defendants claim that SGG Partners and Henkel orally agreed that she would receive $500,000 in compensation in 2010.  Defs. 56.1 Statement ¶ 45.  They point to Gellman's previous testimony that, during discussions in December 2009, she and Henkel "reached agreement on one thing: her compensation for 2010. . . . Because I hoped that Ms. Henkel and I eventually would come to agreement and become partners, I agreed to personally guarantee that she would be paid $500,000 in profit in 2010."  Proscia Decl., Dkt. No. 123, Ex. U ¶ 27.  Gellman later testified that "the only thing that [Henkel and I] agreed on 100 percent was [Henkel] would get guaranteed 500,000."  Proscia Decl., Dkt. No. 123, Ex. X at 173:8-10.  Defendants also cite testimony, however, suggesting Henkel's promised compensation may have been more than $500,000 for 2010.  For instance, they point to Henkel's previous testimony that she and Gellman "agreed that for 2010 neither of us would take a salary but that at the end of the year, I would receive $500,000, then Gellman would receive the next $500,000 *and the remaining profit* (if there was any), if any, *was going to be split 50/50.*"  Proscia Decl., Dkt. No. 123, Ex. T ¶ 47 (emphasis added).

Henkel points to testimony that allegedly shows that she and Gellman did not agree on compensation.  In an affidavit she submitted in response to Defendants' summary judgment motion, she testified that although she "was promised that [she] would receive distributions of not less than $500,000 during 2010," she and Gellman "did not agree to 'cap' [her] compensation at $500,000."  Henkel Aff., Dkt. No. 145, ¶ 5.  In fact, Henkel avers, she and

3

Gellman "never agreed upon any employment compensation terms, or a methodology for compensation for the years 2010 and 2011." *Id.* ¶ 6.[2] Henkel also points to a complaint filed by Gellman and SGG Partners (discussed below) in which they alleged that Gellman and Henkel "never reached agreement on the terms of a possible partnership, or on any terms of Ms. Henkel's employment subsequent to the expiration of her employment contract on December 31, 2009." Russ Decl., Dkt. No. 148, Ex. 12 ¶ 17.

In 2010, Henkel retained Defendants to represent her in her dispute with Gellman and SGG Partners. Pl. 56.1 CS ¶ 68. Defendants filed suit on Henkel's behalf in December 2010 in New York state court. *Id.* ¶ 69. In that lawsuit (the "Underlying Action"), Henkel brought six claims: (1) a claim for a declaratory judgment that she was a member of SGG Partners; (2) breach of an oral partnership agreement in 2007 and 2008; (3) breach of an oral partnership agreement in 2009; (4) a claim for an accounting; (5) promissory estoppel; and (6) unjust enrichment. *Id.* ¶ 70. Henkel argued in the Underlying Action that she and Gellman had entered into an oral contract regarding the terms of a partnership in SGG Partners, and that she was accordingly entitled to a percentage of the company's profits. *Id.* ¶¶ 71-72.

Henkel also sought a preliminary injunction and temporary restraining order to enjoin Gellman from interfering with her management of the day-to-day operations of the Junior Business division of SGG Partners. *Id.* ¶ 77; Prelim. Inj. Op. at 1. In response, Gellman and SGG Partners moved to dismiss Henkel's complaint. Pl. 56.1 CS ¶ 78. Justice Bernard Fried, who presided over the Underlying Action, denied Henkel's request for a preliminary injunction. Prelim. Inj. Op. at 4-5. In an order dated April 18, 2011, he held hat Henkel was "unlikely to succeed on her claim that she and Gellman entered into an enforceable partnership agreement," which the parties agreed was the linchpin of the preliminary injunction application. *Id.* at 1-2, 4, 6.

---

[2] With respect to 2011, Defendants claim that SGG Partners paid Henkel a base compensation rate of $75,000 per year. Pl. 56.1 CS ¶ 55. Henkel denies that there was any agreement to that effect, but acknowledges that she received approximately $28,000 for the months she worked for SGG Partners in 2011. *Id.*

On May 17, 2011, Justice Fried held oral argument on Gellman and SGG Partners'
motion to dismiss the complaint in the Underlying Action. Pl. 56.1 CS ¶ 86. At the hearing,
Justice Fried relayed that he had received a letter from Henkel's counsel indicating that Henkel
would be dismissing Count I of her complaint (the count seeking a declaration that Henkel was a
partner in SGG Partners) and would be seeking to amend the complaint. Proscia Decl., Dkt. No.
123, Ex. DD at 2. Justice Fried explained that, prior to the hearing, he had been planning to
dismiss Henkel's complaint in its entirety, which would have left nothing for Henkel to amend.
*Id.* at 5, 7. He ultimately decided, however, to grant Gellman and SGG Partners' motion to
dismiss, but to decline to make the dismissal a final judgment. *Id.* at 7. Rather, he afforded
Henkel leave to submit a motion for permission to file a new pleading. *Id.* Justice Fried
reminded Henkel that, pursuant to the rules of the First Department of New York's Appellate
Division, any such motion would have to be accompanied by an affidavit of merit. *Id.* At the
close of the hearing, Justice Fried scheduled a status conference for July 21, 2011. *Id.* at 10–11.

Later that day (May 17), Justice Fried issued the promised order granting Gellman and
SGG Partners' motion to dismiss. *See* Amended Compl., Ex. B2 ("Underlying Action Op."). He
found that "the parties indisputably were actively negotiating a written partnership agreement
during 2010," and that accordingly "any oral understandings that Henkel would be made a
partner were not binding upon the parties until that written agreement had been signed." *Id.* at 3.
Justice Fried therefore dismissed Henkel's first four causes of action—her request for a
declaratory judgment that she was a partner in SGG Partners, two claims for breach of an oral
partnership agreement, and an accounting. *Id.* at 4. He also dismissed her promissory estoppel
claim on the grounds that "[a]ny statement by Gellman that she intended to make Henkel a
partner . . . [was] not the sort of clear and unambiguous promise on which a promissory estoppel
claim can be based." *Id.* at 5. And Justice Fried dismissed Henkel's unjust enrichment claim,
without prejudice, because it was "not an appropriate remedy for recovery of the expenses of a
failed negotiation." *Id.* Justice Fried's order confirmed that Henkel had leave "to make any

appropriate motion for leave to replead, attaching an affidavit of merit, as required in the First Department." *Id.*

Henkel's counsel, i.e., Defendants here, did not appear for the July 21, 2011 status conference that had been scheduled at the motion to dismiss hearing. Pl. 56.1 CS ¶ 99. They also did not appear for the rescheduled status conference on September 22, 2011. *Id.* ¶ 111. After counsel failed to appear this second time, Justice Fried issued an order dismissing the Underlying Action *with prejudice*. *Id.* ¶ 112.

As litigation in the Underlying Action unfolded, Henkel departed from SGG Partners. Henkel terminated her relationship with the firm on May 2, 2011—"effective immediately." Pl. 56.1 CS ¶ 85. On or about May 24, 2011, Henkel formed her own executive search firm, HSP Henkel Search Partners ("HSP"). *Id.* ¶ 97. In August 2011, Gellman and SGG Partners filed a lawsuit of their own (the "Gellman Action") against Henkel and HSP in New York state court. *Id.* ¶¶ 100-01. The Gellman Action involved allegations that Henkel had used her role at SGG Partners to misappropriate the firm's confidential business information, disrupt the firm's business, and undermine the firm's relationships with employees and clients before Henkel set out on her own. *Id.* ¶ 104. Henkel and HSP filed an answer in the Gellman Action on October 14, 2011, which included five counterclaims against Gellman and SGG Partners. *Id.* ¶¶ 113-14. Those counterclaims were for (1) breach of an oral employment agreement; (2) quantum meruit; (3) violations of the New York Labor Law; (4) promissory estoppel; and (5) unfair business practice and unfair competition. *Id.* ¶ 114. Henkel was not represented by Defendants in the Gellman Action, which also proceeded before Justice Fried. *See* Proscia Decl., Dkt. No. 123, Ex. HH at 1; Pl. 56.1 CS ¶¶ 117-18.

Gellman and SGG Partners moved to dismiss Henkel and HSP's counterclaims, arguing that they were barred by Justice Fried's dismissal of the Underlying Action with prejudice. Pl. 56.1 CS ¶ 116. At a hearing on the motion, Justice Fried explained that "the [underlying] action was dismissed with prejudice," and that decision was a "disposition on the merits." Russ. Decl., Dkt. No. 149, Ex. 17 at 2. He concluded that "there's no question that the final judgment rule

bars the first four causes of actions and counterclaims; they could have been brought at the time"
of the Underlying Action. *Id.* at 9. Accordingly, in a February 8, 2012 order, Justice Fried
granted Gellman and SGG Partners' motion with respect to Henkl's first four counterclaims, and
that decision subsequently was affirmed on appeal. Pl. 56.1 CS ¶¶ 118-19. The parties to the
Gellman Action voluntarily discontinued all their claims and counterclaims, with prejudice, on
April 2, 2014. *Id.* ¶ 120. The parties signed a Settlement Agreement releasing all of the claims
they had or may have had against one another. *Id.* ¶¶ 121-22. Henkel did not incur any
monetary damages in the Gellman Action as a result of the settlement. *Id.* ¶ 124.

### B.     Procedural History

Henkel commenced this suit against Defendants on May 23, 2012. Dkt. No. 1. As
recounted in a previous order of this Court, Defendants moved to dismiss the complaint under
Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. No. 22. Henkel's initial complaint alleged
that, but for Defendants' negligence in the Underlying Action, she could have successfully
pursued claims against Gellman and SGG Partners under both the theory that she was a partner
in SGG Partners and that she was an employee. *Id.* at 9-10. The Court, however, dismissed
Henkel's malpractice claim to the extent it relied on a partnership theory because all of
Defendants' allegedly negligent conduct occurred *after* Justice Fried rejected the possibility that
Henkel was a partner. *Id.* at 10. But to the extent Henkel's malpractice claim relied on a theory
that she was an employee at SGG Partners, the Court determined that she had plausibly alleged
that she lost her ability to pursue those claims as a result of Defendants' failure to attend the July
2011 and September 2011 conferences. *Id.* at 13. Nonetheless, the Court dismissed Henkel's
complaint because her appeal in the Gellman Action was still pending, and it would therefore
have been premature to conclude that any negligence on the part of Defendants prevented her
from raising the claims that were being appealed. *Id.* at 15. The Court's dismissal was without
prejudice. *Id.* at 16.

After Henkel's appeal in the Gellman Action was rejected, Henkel filed her amended
complaint. Dkt. No. 27. That complaint, which is now the operative pleading in this case,

7

alleges that Defendants' negligence in the Underlying Action prevented Henkel from later raising claims for employment and work-related compensation, quantum meruit, unjust enrichment, and claims under the New York Labor Law. *Id.* ¶ 97. Henkel claims that she suffered damages of approximately $10 million as a result of Defendants' alleged negligence. *Id.* ¶ 121.

Defendants moved for summary judgment on August 13, 2015, and that motion was fully briefed as of November 9, 2015. Dkt. Nos. 122; 153. Defendants also moved to preclude the testimony of Steven E. Hall, Henkel's damages expert. Dkt. No. 114. Henkel moved to preclude the testimony of Dr. Josefina Tranfa-Abboud, a rebuttal expert to Mr. Hall, as well as the testimony of Ray Nardo, Esq., who is offered as a rebuttal expert on the issue of proximate cause. Dkt. Nos. 101, 106. The motions to preclude were fully briefed as of August 31, 2015, and all four motions are presently before the Court.

## II.   SUMMARY JUDGMENT MOTION

### A.   Legal Standard

Summary judgment is appropriate when, after reviewing the parties' submissions in the light most favorable to the non-moving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 45 (2d Cir. 2000). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuinely in dispute" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). Generally, "the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). But when the nonmoving party would bear the burden of proof at trial, "it ordinarily is sufficient for the movant to point to a lack of evidence" supporting the nonmovant's claim. *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). If

"the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" to survive summary judgment. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted); *see also Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011) ("[T]he non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

A district court sitting in diversity applies state substantive law—here, New York law—to an attorney malpractice claim. *Nordwind v. Rowland*, 584 F.3d 420, 429 (2d Cir. 2009). "To state a claim for legal malpractice under New York law, a plaintiff must allege: (1) attorney negligence; (2) which is the proximate cause of a loss; and (3) actual damages." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (citing *Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood*, 573 N.Y.S.2d 981, 985 (N.Y. App. Div. 1991)). In order to establish the proximate cause element of a legal malpractice claim, a plaintiff "must meet the 'case within a case' requirement, demonstrating that 'but for' the attorney's conduct the client would have prevailed in the underlying matter." *Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc.*, 780 N.Y.S.2d 593, 596 (N.Y. App. Div. 2004). In other words, at the summary judgment stage, the plaintiff "must demonstrate that a reasonable fact-finder" in the current proceeding "could conclude that a reasonable fact-finder in the underlying suit would have arrived at a different result but for the attorney's negligence." *Rubens v. Mason*, 527 F.3d 252, 255 (2d Cir. 2008) (internal quotation marks and citation omitted). At times, "[e]xpert testimony is . . . required to establish" whether an attorney's alleged negligence "proximately caused any injury to the plaintiff-client." *Stonewell Corp. v. Conestoga Title Ins. Co.*, 678 F. Supp. 2d 203, 209 (S.D.N.Y. 2010). But where the question of proximate cause turns on an issue that is "purely a matter of . . . law which the court [can] determine[] without the benefit of an expert opinion," no such testimony is required. *Cosmetics Plus Grp., Ltd. v. Traub*, 960 N.Y.S.2d 388, 392 (N.Y. App. Div. 2013).

9

**B.    Discussion**

Defendants seek summary judgment solely on the grounds that Henkel cannot satisfy the proximate cause requirement for a New York legal malpractice claim. Defs. Br. 16. They argue that, even assuming that Defendants were negligent in failing to attend the two 2011 status conferences in the Underlying Action, that negligence did not proximately cause any damage to Henkel because she could not have prevailed on her counterclaims in the Gellman Action. The Court disagrees.

Henkel's amended complaint identifies four causes of action that she allegedly could have brought against Gellman and SGG Partners were it not for Defendants' negligence: claims for employment and work-related compensation, quantum meruit, unjust enrichment, and claims under the New York Labor Law. Amended Compl. ¶ 97.[3] To survive Defendants' summary judgment motion, Henkel must show that there is a genuine dispute as to whether she would have prevailed on at least one of these claims. With respect to the first cause of action, however, Henkel has not argued at the summary judgment stage that she could have recovered employment and work-related compensation under either a breach of contract or promissory estoppel theory. Given that Defendants argued in their opening brief that Henkel could not have prevailed in the Gellman Action on her breach of contract or promissory estoppel counterclaims, *see* Defs. Br. 18-22, the Court holds that Henkel has abandoned those claims. *See Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.").

There are thus three categories of claims at issue in this motion—quantum meruit, unjust enrichment, and New York Labor Law claims. Defendants put forward three reasons why Henkel could not have recovered on those claims in the Gellman Action. First, Defendants argue

---

[3] The counterclaims Henkel actually asserted in the Gellman Action included breach of an oral agreement and promissory estoppel. Pl. 56.1 CS ¶ 114. The Court interprets Henkel's invocation of a claim for "employment and work-related compensation," Amended Compl. ¶ 97, as encompassing those two theories of recovery. As explained *infra*, however, Henkel has abandoned any breach of contract or promissory estoppel claims.

that Henkel would not have been given leave to replead in the Underlying Action, and therefore could not have brought any of the three claims now at issue. Second, Defendants contend that Henkel did not have viable quantum meruit or unjust enrichment claims because she received compensation for her work at SGG Partners. And third, Defendants argue that because Henkel was an executive with managerial responsibilities at SGG Partners, she cannot avail herself of the relevant provisions of the New York Labor Law. The Court concludes, however, that Henkel has introduced sufficient evidence for a reasonably jury to determine that she would have proceeded with, and prevailed on, her quantum meruit and unjust enrichment claims. But the Court agrees that, as a matter of law, Henkel could not have recovered damages under the relevant provisions of the New York Labor Law.

### i.    Leave to Re-Plead

Defendants contend that the Court does not need to reach the merits of Henkel's counterclaims in the Gellman Action because she has not shown that she would have succeeded in a motion for leave to replead in the Underlying Action. Defs. Br. 16. When Justice Fried dismissed Henkel's complaint in the Underlying Action, he made clear that she could "make any appropriate motion for leave to replead." Underlying Action Op. at 5. In New York's First Department, which is where the Underlying Action was pending, a party seeking leave to replead must submit an affidavit of merit along with her proposed pleading. *McBride v. KPMG Int'l*, 24 N.Y.S.3d 257, 263 (N.Y. App. Div. 2016). Defendants contend that, because Henkel's counterclaims in the Gellman Action rested on a theory that she was an employee, not a partner, at SGG Partners, any affidavit of merit would have contradicted her prior sworn statements that she was a partner. Defs. Br. 17. As Defendants put it, "the Underlying Action is littered with assertions by Plaintiff that she was a partner in SGG Partners and not an employee of SGG Partners." *Id.*

Defendants' characterization of Henkel's allegations is accurate but irrelevant. To be sure, courts may deny a party leave to replead if the "proposed amendment would contradict sworn statements by plaintiff." *Burriesci v. Paul Revere Life Ins. Co.*, 255 A.D.2d 993, 994

(N.Y. App. Div. 1998). But courts deny leave to replead under such circumstances when a plaintiff relies on new *factual* allegations that contradict her prior statements. For instance, in *Ouyang v. NYU Hospital Center*, the court denied the plaintiff leave to replead where she first alleged that "the work on her jaw and teeth would take place in two different surgeries," but later filed an affidavit in support of her proposed amendment "stating that 'now, as I recall' . . . the procedure would take place in one day." 2014 N.Y. Misc. LEXIS 5086, at *7-8 (N.Y. Sup. Ct. 2014); *see also Peso v. Am. Leisure Facilities Mgmt. Corp.*, 716 N.Y.S.2d 13 (N.Y. App. Div. 2000) ("Denial of plaintiff's cross motion to amend her complaint was an appropriate exercise of discretion . . . where the alternative theory of negligence proffered by plaintiff was based on *facts* that would contradict her original theory." (emphasis added)). Here, by contrast, Henkel has not changed her version of events. Rather, she has put forward a different legal theory in light of the fact that Justice Fried found that she could not recover under the theory she initially advanced— namely, that she and Gellman had an oral partnership agreement. In fact, the affidavit Henkel submitted at summary judgment remains true to her version of events from the Underlying Action. Henkel testifies that when she was working for SGG Partners *in 2010 and 2011*, she was under the impression that she "was, or would become, a member of SGG Partners LLC under an operating agreement that was being negotiated between Gellman and myself." Henkel Aff., Dkt. No. 145, ¶ 4. Justice Fried's decision, which was rendered in the spring of 2011, concluded, in essence, that Henkel's perception of her employment relationship with SGG Partners was not legally enforceable. *See* Underlying Action Op. at 3-4. But Henkel's prior misperception does not necessarily prevent Henkel from pursuing alternate legal theories, particularly in light of the fact that Justice Fried initially dismissed the Underlying Action without prejudice. *See id.* at 5.

In any event, Henkel does not need to prove that a motion for leave to replead in the Underlying Action would have been granted in order to prevail here. The counterclaims at issue were not brought in the *Underlying* Action; they were brought in the *Gellman* Action. And as Henkel points out, those "counterclaims were not dismissed because Defendants failed to seek or obtain leave to amend." Opp. Br. 9. Rather, they were dismissed "because of the 'with

prejudice' dismissal of [the Underlying Action]." *Id.* As such, Henkel needs only to show that there is a genuine dispute as to whether, but for Defendants' alleged negligence, she could have proceeded with her counterclaims in the Gellman Action. Henkel has met this burden. She points to language from a hearing in the Gellman Action in which Justice Fried indicated that he dismissed Henkel's counterclaims because "the [Underlying] action was dismissed with prejudice," which converted the dismissal into "a disposition on the merits." Opp. Br. 12 (quoting Russ. Decl., Dkt. No. 149, Ex. 17 at 2). Defendants fail to engage with Henkel's argument on this point, contending in their reply brief only that Henkel "failed to create any questions of facts whether [she] would have succeeded on . . . a motion for leave to replead." Reply Br. 4. But again, this case turns on Henkel's counterclaims in the Gellman Action, not whether she could have repleaded in the Underlying Action.[4] Henkel has created a genuine issue of fact as to whether she could have brought her counterclaims in the Gellman Action but for Defendants' failure to attend the two state court conferences in 2011. Accordingly, the Court turns to the merits of those counterclaims.

### ii.    Quantum Meruit and Unjust Enrichment

The principal contention in Henkel's opposition brief is that she could have prevailed on counterclaims for quantum meruit and unjust enrichment in the Gellman Action. *See* Opp. Br. 1, 12-19. In the context of a summary judgment motion on a legal malpractice claim, Henkel must show that a reasonable juror *could* find that a reasonable factfinder in the Gellman Action *would have found* that Henkel could recover for these claims. *Rubens*, 527 F.3d at 255. "In order to recover in *quantum meruit*, New York law requires a claimant to establish '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir. 1994) (quoting *Martin H.*

---

[4] Perhaps there is reason to believe that, even if Justice Fried had not dismissed the Underlying Action with prejudice, he would not have allowed Henkel to bring her counterclaims in the Gellman Action without first seeking leave to replead in the Underlying Action. If such reasons exist, however, Defendants have failed to identify them.

*Bauman Assocs., Inc. v. H & M Int'l Transp., Inc.*, 567 N.Y.S.2d 404, 408 (N.Y. App. Div. 1991)).

Defendants do not dispute, at the summary judgment stage, that Henkel performed services for SGG Partners in good faith, that SGG Partners accepted those services, or that there was an expectation of compensation. *See* Defs. Br. 24 & n.7. Rather, Defendants' summary judgment motion with respect to Henkel's quantum meruit claim rests entirely on the argument that "the reasonable value for [Henkel's] services was established," in that Henkel "was paid her agreed-to guaranteed compensation of $500,000 for 2010."[5] *Id.* at 24. But Henkel has created a genuine dispute of fact as to whether Defendants' characterization is accurate.

There is ample evidence in the record that Henkel and Gellman did not agree on what Gellman would pay Henkel during 2010 and 2011. Henkel avers in her affidavit that she and Gellman "never agreed upon any employment compensation terms, or a methodology for compensation for the years 2010 and 2011." Henkel Aff., Dkt. No. 145 ¶ 6. Defendants' only response to this evidence is to reiterate the claim that Henkel's affidavit in this action contradicts her prior sworn testimony. *See* Reply Br. 9 (asserting that "Plaintiff's sham affidavit should be summarily rejected and disregarded"). But as explained above, there is no basis for rejecting Henkel's affidavit, as it contains no contradictory factual allegations. And even if the Court were to disregard the affidavit, there is still significant evidence in the record from which a reasonable jury could conclude that Henkel and Gellman did not agree on compensation terms. For instance, Henkel offered testimony in the Underlying Action that she and Gellman "agreed that for 2010 neither of [them] would take a salary but that at the end of the year, [Henkel] would receive $500,000, then Gellman would receive the next $500,000 and the remaining profit (if there was any), if any, was going to split 50/50." Proscia Decl., Dkt. No. 123, Ex. T ¶ 47. While this testimony indicates that Henkel thought $500,000 was a floor for the possible

---

[5] Defendants devote minimal attention in their summary judgment briefing to Henkel's compensation for 2011, but the Court's analysis as to the status of any agreement, or lack thereof, between Henkel and Gellman applies to both 2010 and 2011.

compensation she would receive, it does not indicate that she agreed to receive *only* $500,000. Finally, the allegations in the complaint in the Gellman Action suggest the parties did not agree on Henkel's compensation. That complaint alleged that Gellman and Henkel "never reached agreement on the terms of a possible partnership, or on any terms of Ms. Henkel's employment subsequent to the expiration of her employment contract on December 31, 2009." Russ Decl., Dkt. No. 148, Ex. 12 ¶ 17.

If the parties never agreed on the terms of Henkel's compensation, then Henkel may be able to recover in quantum meruit, even though Defendants did pay Henkel some amount of compensation. In *Longo v. Shore & Reich, Ltd.*, the Second Circuit held that an employee could recover in quantum meruit for the three months in which she worked for the defendant while engaged in ongoing contract negotiations. 25 F.3d at 98. When the plaintiff in *Longo* began working for the defendant—in June 1990—"no contract had yet been executed," but the plaintiff received and signed an employment agreement that specified an annual salary of $175,000. *Id.* at 96. The defendant, however, never signed the agreement. *Id.* Three months after she began working, the plaintiff was terminated. *Id.* At the time of her termination, the plaintiff had been paid $43,061.65, which was proportional to the $175,000 salary promised in the employment agreement. *Id.* The Second Circuit nonetheless held that, in the absence of a written agreement signed by both parties, the plaintiff was entitled to recover the reasonable value of her services under the doctrine of quantum meruit. *Id.* at 97-98. In reaching that holding, the court explained that it was error for the district court to rely "on the salary provision of the unsigned agreement . . . in holding that the plaintiff was entitled only to the 'agreed upon' salary and could not recover in *quantum meruit.*" *Id.* at 97. Rather, the court held that it "remains for the factfinder to determine the reasonable value of [the plaintiff's] services, which may be more than, less than, or the same as the compensation that she has already received." *Id.* at 98.

The facts of *Longo* apply squarely to this case. Like the plaintiff in *Longo*, Henkel claims that she worked for Defendants under the shadow of a possible compensation agreement, but without mutually agreed-upon terms. Accordingly, Henkel may be entitled to recover in

15

quantum meruit for the reasonable value of her services during the time she was employed at SGG Partners. Like in *Longo* though, it would be the responsibility of a factfinder to determine whether the reasonable value of those services was "more than, less than, or the same as the compensation that [Henkel] has already received." 25 F.3d at 98. Defendants' only response to Henkel's reliance on *Longo* is again to claim that there is "no dispute as to Plaintiff's rate of compensation during 2010." Reply Br. 9. Yet that is precisely what Henkel claims is in dispute, and as explained above, a reasonable jury could well agree.

In order to prevail on an unjust enrichment claim, "a plaintiff must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (internal quotation marks, citation, and alteration omitted). But as the Second Circuit has explained, courts applying New York law "may analyze quantum meruit and unjust enrichment together as a single quasi contract claim." *Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005). Accordingly, the Court need not consider Henkel's unjust enrichment counterclaim separately, as the result is the same.

Defendants, however, make two arguments that are phrased as responding only to the unjust enrichment claim. Both arguments are unavailing. First, Defendants contend that Henkel cannot "employ an unjust enrichment claim as a substitute for a deficient breach of contract claim." Defs. Br. 23. Second, they similarly argue that "an unjust enrichment claim may not be used to evade New York's Statute of Frauds." *Id.* at 23-24. These arguments misapprehend the nature of Henkel's claims. She is not arguing that she would have had a valid breach of contract claim but for the fact that any agreement she reached with Gellman could not "be performed within one year from the making thereof." *Cron v. Hargro Fabrics, Inc.*, 694 N.E.2d 56, 58 (N.Y. 1998) (internal quotation marks and citation omitted). Instead, Henkel is arguing that in light of the fact that a court has determined that she and Gellman did not reach an enforceable agreement as to whether she was a partner at SGG, she should nonetheless receive the reasonable

value of the services she provided. For the reasons outlined above, a reasonable jury could find that she would have prevailed on a counterclaim to that effect in the Gellman Action. Accordingly, the Court denies Defendants' summary judgment motion with respect to Henkel's quantum meruit and unjust enrichment claims.

### iii.   New York Labor Law Claims

Henkel contends that she would have had a meritorious counterclaim in the Gellman Action for violations of Article 6 of the New York Labor Law, i.e., the portion of the Labor Law that governs payment of wages. Specifically, Henkel claims that she would have recovered under § 191, which regulates the frequency with which employers must pay certain employees, and § 193, which restricts the circumstances under which an employer can make deductions from an employee's wages. Opp. Br. 19-20. Henkel also claims that these violations of the New York Labor Law would have entitled her to liquidated damages under § 198. *Id.* The Court disagrees.

In assessing whether Henkel can recover under Article 6 of the New York Labor Law, the first step is to determine which, if any, of the Law's definitions apply to the work Henkel did at SGG Partners. Defendants claim, and Henkel does not challenge, that Henkel was a "management employee" with "supervisory, managerial, executive, and administrative" responsibilities. Defs. Br. 22; *see also* Opp. Br. 19-20. Henkel nonetheless qualifies as an "employee" under § 190 of the New York Labor Law—a term that covers "any person employed for hire by an employer in any employment." N.Y. Lab. Law § 190(2); *see also Pachter v. Bernard Hodes Grp., Inc.*, 891 N.E.2d 279, 282 (N.Y. 2008) (noting that this definition "plainly embraces executives"). In addition to providing a broad definition of "employee," however, § 190 defines narrower classes of workers and employees, such as "commission salesman." *See* N.Y. Lab. Law § 190(6). That term "does not include an employee whose principal activity is of a supervisory, managerial, executive or administrative nature." *Id.* Accordingly, although Henkel is an "employee" for purposes of the New York Labor Law, she is not a "commission salesman."

17

This distinction bars Henkel's claim under § 191 regarding the frequency of wage payments. Section 191(1) imposes obligations on employers with respect to four categories of employees: manual workers, railroad workers, commission salespersons, and clerical and other workers. N.Y. Lab. Law § 190(1). Henkel argues that she can recover under § 191 as a commission salesperson, *see* Opp. Br. 19, but it is "firmly established that § 191 is inapplicable to executives," *Malinowski v. Wall St. Source, Inc.*, No. 09-CV-9592 (PAE), 2012 WL 279450, at *3 (S.D.N.Y. Jan. 31, 2012); *see also Pachter*, 891 N.E.2d at 282 (explaining that the purpose of defining subcategories of employees in § 190 "is to eliminate executives from particular requirements in article 6, such as the frequency of wage payments to manual workers, railroad workers, commission salespersons and clerical or other workers"). Henkel argues that "§ 191 requires that employers make periodic wage payments to those defined as 'employees' *as well as* those who are 'commissioned salespersons,'" but she cites no authority in support of that proposition. Opp. Br 19 (emphasis added). In light of the clear authority against Henkel's position, she could not have recovered under § 191 in the Gellman Action.

Henkel also could not have recovered under § 193 of the New York Labor Law, which restricts when an employer can make deductions from the wages of an employee. *See* N.Y. Lab. Law § 193. Henkel points to no evidence that SGG Partners made any deductions—much less unauthorized ones—from her wages. Her only argument with respect to § 193 is that "where amounts of commissions, bonuses or other additional compensation are subject to a fixed formula and such payments are not made by the employer, an employee may recover such compensation under Labor Law § 193." Opp. Br. 19. But Henkel has not shown that any of the payments SGG Partners made to her were subject to such a fixed formula. To the contrary, all of the evidence she has introduced in support of her quasi-contract claim tends to show the opposite—that there was no agreement, much less a fixed formula, governing her compensation. Without evidence of improper deductions from Henkel's wages, no reasonable juror could conclude that she would have recovered under § 193 in the Gellman Action. And as Henkel acknowledges, any recovery of liquidated damages under § 198 requires that a plaintiff first

18

"*successfully* assert[] a claim under Article 6 of the New York State Labor Law." Opp. Br. 19

(emphasis added).  She therefore could not have recovered any liquidated damages in the

Gellman Action.

In light of the foregoing, Defendants' motion for summary judgment is granted with

respect to Henkel's New York Labor Law claims.


## III.    MOTIONS TO PRECLUDE

### A.    Legal Standard

The party seeking to introduce expert testimony "bears the burden of establishing its

admissibility by a preponderance of the evidence." *Baker v. Urban Outfitters, Inc.*, 254 F. Supp.

2d 346, 353 (S.D.N.Y. 2003).  Federal Rule of Evidence 702 allows expert testimony if:

> (a) the expert's . . . specialized knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or
> data; (c) the testimony is the product of reliable principles and methods; and (d) the
> expert has reliably applied the principles and methods to the facts of the case.

In evaluating expert testimony under this standard, the court acts as a gatekeeper to "ensur[e] that

an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

The reliability inquiry envisioned by *Daubert* is "a flexible one," *id.* at 594, and the

factors to be considered "depend[] upon the particular circumstances of the particular case at

issue." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).  The Second Circuit has

emphasized that courts should focus on "the indicia of reliability identified in Rule 702, namely,

(1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the

product of reliable principles and methods'; and (3) that 'the witness has applied the principles

and methods reliably to the facts of the case.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303

F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702).  This "flexible *Daubert* inquiry gives

the . . . court the discretion needed to ensure that the courtroom door remains closed to junk

science while admitting reliable expert testimony." *Id.* at 267.

Exclusion of expert testimony "remains 'the exception rather than the rule.'" *Vazquez v. City of N.Y.*, No. 10-CV-6277 (JMF), 2014 WL 4388497, at \*12 (S.D.N.Y. Sept. 5, 2014) (quoting *Floyd v. City of N.Y.*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012)).   While courts should exclude testimony that is "based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal quotation marks and citations omitted).   "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## B.     Discussion

There are three motions to preclude before the Court.   Defendants have moved to preclude the testimony of Henkel's damages expert, Steven E. Hall.   Henkel has moved to preclude the testimony of Dr. Josefina Tranfa-Abboud, Defendants' rebuttal expert to Mr. Hall, and Ray Nardo, Esq., Defendants' rebuttal expert on the issue of proximate cause.[6]   For the reasons that follow, all three motions are denied.

### i.     Plaintiff's Expert Steven E. Hall.

Defendants have moved to strike the expert report of Steven E. Hall and to preclude him from offering the opinions contained in his report at trial.   Dkt. No. 114.   Henkel has put forward Mr. Hall as an expert in "executive compensation."   Pl. Hall Br. 1.   Mr. Hall is the co-founder and Managing Director of Steven Hall & Partners, an executive compensation consulting firm. Proscia Decl., Dkt. No. 115, Ex. A ("Hall Report") at 1.   He avers that he has more than 35 years of experience advising corporate boards, senior managements, and others on compensation

---

[6] Given that there are three sets of briefs pertaining to the motions to preclude—one set for each expert— the Court identifies each brief according to the party that authored it and the expert to which it pertains.  Thus, "Defs. Hall Br." refers to the brief Defendants submitted in support of their motion to preclude Mr. Hall's testimony, and "Pl. Nardo Reply Br." refers to the reply brief that Henkel filed in support of her motion to preclude Mr. Nardo's testimony.

packages, employment contracts, and marketplace surveys of compensation plans. *Id.*
Additionally, he indicates that he has worked directly with executive recruiting firms and has
provided advice on designing compensation plans for recruiters. *Id.* at 2. In his report, Mr. Hall
concludes that the "fair and reasonable value of the services performed by Ms. Henkel for SGG
Partners" totaled $4,925,000, which would mean that SGG Partners owes Henkel $4,406,250
after subtracting the $518,750 she has already been paid. *Id.* at 4. Mr. Hall reached this
conclusion based on "independent research, [his] first-hand experience within the search
industry, and information which [he] obtained from industry contracts, who have provided
insights into compensation practices at top tier recruiting firms." *Id.* He also spoke with Henkel
about her responsibilities at SGP/JSY and SGG Partners, as well as about the revenues generated
during her tenure, and reviewed many of the documents in this case. *Id.* at 3-4.

Defendants argue for precluding Mr. Hall's testimony on the grounds that his report "is
not based upon published and available data" and because the methodology he applied is
unsound. Defs. Hall Br. 5. Defendants' first argument goes to whether Mr. Hall's testimony "is
grounded on sufficient facts or data." *Amorgianos*, 303 F.3d at 265. Mr. Hall contends in his
report that "due to the confidential and proprietary nature of the search business," published data
on executive search firm compensation "is not available." Hall Report at 4. Citing the report of
Dr. Abboud, who Defendants have offered as a rebuttal expert, Defendants claim that published
data as to executive recruiting firms "was in fact available" and that Mr. Hall "failed to conduct
any independent research to determine the availability of the data." Defs. Hall Reply Br. 2. As
an initial matter, the argument that Mr. Hall *could* have considered published data does not go to
the sufficiency of the data on which he *did* rely. Defendants do not challenge Mr. Hall's claim
that he has prior experience working with individuals in the executive search industry, nor his
claim that he relied on industry contacts to provide insight into the compensation practices at top
tier recruiting firms. The Federal Rules of Evidence permit an expert to base his opinion "on
facts or data in the case that the expert has been made aware of or personally observed. If
experts in the particular field would reasonably rely on those kinds of facts or data in forming an

21

opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R.

Evid. 703. Here, it was reasonable for Mr. Hall to rely on individuals with knowledge about

executive search compensation in assessing the value of the services of an executive search firm

employee like Henkel.

Moreover, there is good reason to be skeptical of Defendants' reliance on the data

referenced in Dr. Abboud's report, which Dr. Abboud claims is evidence that Mr. Hall should

have known that compensation data for executive search firms is available. Although

Defendants did not attach copies of or quote from any of the sources that Dr. Abboud describes,

the Court has reviewed each of the articles cited in Exhibit 2 of her report. *See* Proscia Decl.,

Dkt. No. 115, Ex. B ("Abboud Report"), Ex. 2 at 4. Several of the articles listed do not even

purport to offer data as to executive recruiting compensation. Others clearly apply to recruiting

firms, or recruiting positions, that are in a separate tier from SGG Partners and Henkel's role

therein. For instance, the promising-sounding article titled "Executive Recruiter Salaries in New

York City, NY," appears to rely on a data set of 21 salaries and concludes that the "average"

executive recruiter salary in the New York area is $42,288 and that the "maximum" salary is

$115,000. *Executive Recruiter Salaries in New York City, NY*, glassdoor (Mar. 24, 2016),

https://www.glassdoor.com/Salaries/new-york-city-executive-recruiter-salary-

SRCH_IL.0,13_IM615_KO14,33.htm. This evidence is plainly inapplicable to assessing the

value of the services of an individual who Defendants claim to have paid a $500,000 annual

salary. Particularly in light of the alternative sources proffered by Defendants, Henkel has

demonstrated that Mr. Hall based his report on sufficiently reliable information to survive a

motion to preclude.

Defendants' second argument for precluding Mr. Hall's testimony is that his

methodology was unsound. Defendants provide a laundry list of alleged flaws in how Mr. Hall

arrived at his estimation of the reasonable value of Henkel's services, including that he relied on

Henkel's representations as to the revenues she was responsible for and failed to appropriately

assess the revenues that SGG Partners collected from her work. Defs. Hall Br. 5-6. These

arguments "go to the weight, not the admissibility, of the testimony." *Boucher*, 73 F.3d at 21.
To the extent Defendants wish to question the reliability of Henkel's account of the revenue she
generated, or highlight documents that Mr. Hall may have failed to consider, cross-examination
is "an appropriate way of attacking weak expert testimony, rather than complete exclusion."
*Olin Corp. v. Certain Underwriters at Lloyd's London*, 468 F.3d 120, 134 (2d Cir. 2006).
Accordingly, Defendants' motion to preclude Mr. Hall's testimony and strike his report is
denied.

### ii.     Defendants' Expert Dr. Josefina Tranfa-Abboud

As indicated above, Defendants have put forward Dr. Josefina Tranfa-Abboud as a
rebuttal expert to Mr. Hall.[7]  *See* Defs. Abboud Br. 2.  Dr. Abboud is a principal in the Litigation
and Corporate Financial Advisory Services Group of Mark Paneth LLP, where her
responsibilities include preparing export reports in labor and employment law litigation.  Abboud
Report, Ex. 1 at 1.  She has a Ph.D. in economics from Florida State University, and she has
nearly twenty years of experience working as an economist in the United States.  *Id.* at 1-2.  The
report she prepared for this case critiques the "assumptions, methodology, and analysis" in Mr.
Hall's expert report.  Abboud Report at 4.  Henkel has moved to strike Dr. Abboud's expert
report and preclude her from testifying at trial.  *See* Dkt. No. 101.

Henkel puts forward numerous arguments as to why the Court should preclude Dr.
Abboud's testimony, but they can broadly be grouped into three categories.  First, Henkel argues
that Dr. Abboud is not an expert in the field of executive compensation, and that she does not
have the necessary qualifications to provide testimony in that field.  Pl. Abboud Br. 4, 6-14.  But
Henkel refutes her own argument by noting that "Dr. Tranfa-Abboud is not offering any opinions
within the field of executive compensation [and] search/recruiting."  *Id.* at 8.  Rather, Defendants
are relying on her expertise in economics, and her familiarity with labor and employment
litigation, to critique the methodology of Mr. Hall's report.  *See Luitpold Pharm., Inc. v. Ed.*

---

[7] Defendants refer to Dr. Josefina Tranfa-Abboud as "Dr. Abboud," rather than "Dr. Tranfa-Abboud." *See*
Defs. Abboud Br. 5.  The Court therefore does the same.

*Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11-CV-681 (KBF), 2015 WL 5459662, at
*12 (S.D.N.Y. Sept. 16, 2015) ("A rebuttal expert, by nature, criticizes the methodology and/or
opinions of another.").

Second, Henkel claims that Dr. Abboud "has no method or practice in forming an
opinion, and has offered no model or theory." Pl. Abboud Br. 5, 14-16. But Dr. Abboud does
not need a "model or theory" to identify purported flaws in Mr. Hall's testimony. Rather, she
needs only her expertise and the "method" identified at the beginning of her report—namely,
reviewing the documents in this case, along with Mr. Hall's report, and arriving at an opinion as
to Mr. Hall's analysis of the alleged economic damages to Henkel. Abboud Report at 3.

And third, Henkel asserts that Dr. Abboud's testimony is "unreasonable, unreliable and
mere speculation." Pl. Abboud Br. 5, 16-17. Henkel's arguments in support of this claim,
however, consist of an unsourced characterization of SGG Partners' tax status (which if true
would be a fair subject of cross examination) and an argument about when a plaintiff may
recover in quantum meruit that is unrelated to Dr. Abboud's testimony. *Id.* at 16-17. Henkel's
characterization of Dr. Abboud's testimony is meritless.

To be sure, parts of Dr. Abboud's report advance arguments that do not require expert
testimony. For instance, Dr. Abboud points out that Mr. Hall "fails to provide specific citations
to the source[s] of information" in his report, *id.* at 6, and argues that it is "contradictory" to
claim that public data concerning executive recruiter salaries do not exist while providing
testimony as to the structure of recruiters' compensation, *id.* at 14. But other parts of the report
provide the kind of "specialized knowledge [that] will help the trier of fact to understand the
evidence or to determine a fact in issue," as envisioned by Rule 702. Fed. R. Evid. 702. For
instance, Dr. Abboud explains why relying on SGG Partners' Profit & Loss Statements may not
be a reliable basis for determining the firm's revenues. Abboud Report at 7. And she provides
analysis calling into question Mr. Hall's assumptions in calculating what percentage of SGG
Partners' revenue Henkel was responsible for. *Id.* at 13-16. This testimony rests on a

sufficiently "reliable foundation" to survive Henkel's motion to preclude. *See Daubert*, 509 U.S. at 597.

### iii.    Defendants' Expert Ray Nardo, Esq.

Defendants have offered Ray Nardo, Esq., as a rebuttal expert to Alice B. Stock, Esq. Ms. Stock is one of Henkel's proposed experts, and her report concerns "the legal claims that Ms. Eleni Henkel . . . could have successfully asserted against SGG." Russ. Decl., Dkt. No. 110, Ex. B ("Stock Report") at 1. Mr. Nardo has been a practicing labor law attorney for more than 25 years. Russ. Decl., Dkt. No. 110, Ex. C ("Nardo Report") at 1. He has published several articles on employment law, and he is a member of the National Employment Lawyers Association. *Id.* at 2. In connection with this case, Mr. Nardo reviewed many of the documents in the record and offers his opinion as to the issue of proximate cause—i.e., whether "but for defendants' alleged negligence, [Henkel] would have prevailed on her employment claims against Gellman or SGG Partners, LLC." *Id.* at 3-4, 5.

Henkel has moved to preclude Mr. Nardo's testimony. At the outset, the Court notes that Henkel's brief in support of her motion is confusing, engages in ad hominem attacks on Mr. Nardo, and contradicts other portions of Henkel's written submissions. For instance, it mocks Mr. Nardo's decision to offer his opinion on Henkel's unjust enrichment claim as "a waste of time and completely irrelevant because Plaintiff seeks damages based upon quantum meruit." Pl. Nardo Br. 13. *But see* Opp. Br. 19 ("Plaintiff had a meritorious and successful counterclaim based on unjust enrichment."). As best the Court can tell, however, Henkel's objections to Mr. Nardo's testimony boil down to two arguments. First, that Mr. Nardo is not actually an expert in "proximate cause," and second, that Mr. Nardo engaged in an inaccurate and contradictory analysis of the merits of Henkel's labor law claims. These arguments are meritless.

First, Henkel argues that Mr. Nardo "has no experience in . . . the doctrine of proximate cause" and that "proximate causation [is] beyond the scope of expert testimony." Pl. Nardo Br. 8. This argument misunderstands the nature of the proximate cause inquiry in a legal malpractice case, as well as the role of Henkel's own expert, Ms. Stock. As explained

previously, a legal malpractice plaintiff must show that "but for' the attorney's [negligent] conduct the client would have prevailed in the underlying matter." *Weil*, 780 N.Y.S.2d at 596. Thus, in order to show that Defendants proximately caused her loss, Henkel has to convince a reasonable factfinder that she would have prevailed on at least one of her counterclaims in the Gellman Action. Henkel has attempted to do so, and has put forward Ms. Stock to testify on that question. Ms. Stock's report explains that, in her view, "Henkel could have recovered her unpaid compensation from SGG under a quantum meruit cause of action," "under an unjust enrichment theory of recovery," and that Henkel "should recover liquidated damages . . . under New York Labor Law § 198." Stock Report at 8, 10, 12. Mr. Nardo's report reaches different conclusions, but he engages in the same kind of analysis as Ms. Stock. His decades of experience in employment and labor law render him qualified to assess whether Henkel would have prevailed on her counterclaims. Mr. Nardo need not be an expert on the issue of "proximate cause" in the abstract to be an expert on the specific proximate cause inquiry that is relevant to this case—i.e., whether the labor law counterclaims that Henkel put forward in the Gellman Action would have been meritorious.[8]

The remainder of Henkel's brief in support of her motion to preclude attacks Mr. Nardo's conclusions on the grounds that he relied on inaccurate understandings of New York law, made

---

[8] At trial in this action, assessing the merits of Henkel's quantum meruit and unjust enrichment counterclaims will require resolving both issues of law and fact. But determinations that are "purely a matter of . . . law" must be made by this Court "without the benefit of an expert opinion." *Cosmetics Plus*, 960 N.Y.S.2d at 392. At most then, expert testimony as to the viability of Henkel's counterclaims is admissible only if it aids the jury in assessing how a factfinder would rule on her quantum meruit and unjust enrichment claims. But given that a legal malpractice jury is itself a finder of fact, there is reason to question whether this Court should permit *any* expert testimony on the question of whether Henkel would have prevailed on her counterclaims in the Gellman Action. Several courts have held that such testimony impermissibly encroaches on the jury's role. *See, e.g.*, *Hickey v. Scott*, 796 F. Supp. 2d 1, 5 (D.D.C. 2011) ("[I]n attorney malpractice cases where causation requires proof of what would have happened in the underlying 'case within the case,' courts simply instruct the jury on the legal aspects of the case, and then leave it to the jury to decide, based on the law, what a reasonable fact-finder would have concluded if the attorney had not been negligent." (internal quotation marks and citation omitted)); *Leibel v. Johnson*, 728 S.E.2d 554, 556 (Ga. 2012) (holding that evaluating the merits of the "case-within-a-case" is "a task that is solely for the jury [in a malpractice action], and that is not properly the subject of expert testimony"). Both parties have put forward experts to testify about whether Henkel would have succeeded in litigating her counterclaims in the Gellman Action, and accordingly, neither party has addressed whether such testimony is permissible. The parties will therefore be given a chance to brief the question of whether the Court may permit any expert testimony as to the merits of Henkel's counterclaims in the Gellman Action.

contradictory statements, and drew incorrect conclusions as to the viability of Henkel's claims. All of these are arguments that Henkel is free to make on cross-examination or through the testimony of her expert. They do not call into question, however, that Mr. Nardo reliably applied his considerable expertise in labor and employment law to his understanding of the facts of this case. *See Amorgianos*, 303 F.3d at 265. Henkel's motion to preclude his testimony is denied.

## IV.    CONCLUSION

In sum, Defendants' summary judgment motion is granted with respect to Henkel's New York Labor Law claims, but is otherwise denied. Accordingly, Henkel cannot argue at trial that Defendants' alleged negligence prevented her from bringing any New York Labor Law claims in the Gellman Action. Defendants' motion to preclude the expert testimony of Mr. Hall is denied, and Henkel's motions to preclude the expert testimony of Dr. Abboud and Mr. Nardo are both denied. This resolves Docket Nos. 101, 106, 114, and 122.

The Court will hold a case management conference in this action on April 22, 2016, at 4:00 p.m. In advance of that conference, the parties are ordered to meet and confer to engage in settlement discussions and to discuss a joint proposed schedule for the case. The parties shall submit a joint letter, no later than April 15, 2016, that (a) updates the Court on the status of settlement discussions, (b) suggests a deadline for the submission of a joint pre-trial report pursuant to Rule 5.A of the undersigned's Individual Practices in Civil Cases, (c) proposes a briefing schedule for addressing whether this Court should exclude all expert testimony on the merits of Henkel's counterclaims in the Gellman Action, *see* n.8, *infra*, and (d) suggests potential trial dates.

SO ORDERED.

Dated: March 29, 2016
        New York, New York

_____
ALISON J. NATHAN
United States District Judge

27